## UNITED STATES v. WALKER.
### No. 267, Docket 21357.

United States Court of Appeals
Second Circuit.
July 25, 1949.

CLARK, Circuit Judge, dissenting.

Martin Kingsley, New York City, for appellant.

Harold J. McAuley, New York City, for appellee.

Before L. HAND, Chief Judge, and CLARK and FRANK, Circuit Judges.

## L. HAND, Chief Judge.

The defendant appeals from a conviction under an indictment in two counts, for transporting from Houston, Texas, to New York City sums of money, "taken feloniously by fraud and with intent to steal and purloin."[1] The first count alleged the transportation of $26,000 on February 17, 1947; the second, that of $23,500 on June 1, 1947. The defendant complains of five alleged errors committed during the trial: (1) that testimony was admitted against him of other similar offences; (2) that the evidence did not prove that he acquired any money by fraud; (3) assuming that he did, that the money which he "transported" was not that which he had so acquired; (4) that the court admitted the testimony of agents of the Federal Bureau of Investigation of admissions made by him to them before he had been arraigned; (5) that his wife was allowed to testify against him. The gravamen of the crime was obtaining two large sums of money by fraud from one, Mary Ashe, and taking them with him from Houston to New York, after he had gone through the form of marrying her, when he was already married to another. He had made Mary Ashe's acquaintance on a train and by his glitter impressed her with his importance; he followed her to Houston, which was her home, and, pretending that he was a man of great wealth and position, he inveigled her into marrying him. A former husband had settled upon her a warehouse in Houston which the defendant prevailed upon her to mortgage; and she gave him the proceeds, most of which he took with him on their wedding trip to New York. That was the offence charged in the first count. About three months later he persuaded her to sell the equity in the same warehouse and again to give him the proceeds, with which he and she once more went from Houston to New York. That was the offence charged in the second count. It is not necessary to state in detail the rodomontade by which he led on his unfortunate victim. We do not understand that he denies that, if it was false, he obtained the money by fraud; what he does assert is that the prosecution did not prove that in fact it was false. The money which he got from her the first time she gave him in the form of a cheque that she had received from the mortgagee. She went with him to a bank where he cashed it, and got in exchange two cheques of the bank to the order of the Railway Express Agency (one for $10,000 and one for $7,000), $3,000 in American Railway Travellers cheques, and $6,000 in cash. On the same day he exchanged the $7,000 cheque for an "unlimited" cheque (whatever that was), and the $10,000 cheque for 100 Travellers cheques. The evidence amply supported a finding that he carried much more than $5,000 of the Travellers cheques from Houston to New York. The transactions by which he exchanged the second cheque for the equity were so like the first, that we need not state them. On this occasion also he took more than $5,000 in Travellers cheques from Houston to New York.

The first alleged error is the admission of the testimony of two witnesses—Clara Duerr Walker and Sally Grehan—whom the defendant had defrauded in the same way that he defrauded Mary Ashe. He had gone through the form of marriage with both these women, and in the case of Clara Duerr Walker this resulted in a lawful marriage. Each of these witnesses testified that he picked her up, one at a restaurant, the other on a train, as he had picked up Mary Ashe; and that he followed up the acquaintance and persuaded her to marry him. He married Clara Duerr Walker on June 8, 1945, and, although it does not appear that he got any money from her thereafter, he had already persuaded her to lend him over $15,000, to obtain which she was obliged to sell her real estate. The braggadocio which he fed her was in large measure identical with that by which he hoodwinked Mary Ashe. Finally he dispatched her, first to Canada, and later to Alaska, where she lived in destitution

---

[1] § 415 [now § 2314], Title 18 U.S.C.A.

until her eyes were at length opened, and at the time of the trial she had brought a suit against him for divorce. He proceeded in substantially the same way to defraud Sally Grehan of over $20,000, to obtain which she was obliged to sell most of her property, and to make herself also nearly destitute.

The judge admitted the testimony of these witnesses upon the issue of the defendant's fraudulent intent in the transactions charged, under the doctrine that, whenever specific intent is an element in a crime, other transactions of the same kind are relevant to show that the required intent was present upon the occasion in question. The doctrine is general and well established; we discussed its rationale in National Labor Relations Board v. National Seal Corporation;[2] and we know of no exception in this circuit unless it be Marshall v. United States,[3] which we have several times declared that we would not follow.[4] So far as that decision can be thought to have any vestigial authority, we take this occasion definitively to overrule it. Such testimony must indeed relate to an occasion near enough in kind to be rationally probative; but in the case at bar the defendant in dealing with Mary Ashe followed the pattern that he had employed in the cases of Clara Duerr Walker and Sally Grehan almost to the letter. The admission of this testimony was plainly right.

It is difficult to treat seriously the second alleged error: i. e. that there was no evidence to support a finding that the allurements, by which the defendant cajoled Mary Ashe out of her money, were not proved to be false. He appears to suppose that the prosecution failed on this issue, because it did not show in detail that he was not a man of ample means, that he did not own a racing stable with its proper colors, that he had no trust funds, "tied up" by income tax troubles, that he needed money only for temporary pecuniary relief from his embarrassments, or any of the other lies that he told Mary Ashe. That was not necessary, for the record discloses the trail of a patent swindler, who three times played upon the credulity of single women, fleeced them of all they had, and abandoned them. A jury who did not infer from this history that the enticements were false by which he abused his victims' confidence, would be incompetent to serve at all.

The third alleged error is a trifle more debatable: i. e. that, even conceding that the two cheques which Mary Ashe gave to the defendant were "taken feloniously by fraud", he did not violate the statute, because he did not carry either of them with him from Houston to New York. We are by no means prepared to hold that, whenever any one fraudulently obtains the property of another, the proceeds are not also "taken feloniously by fraud", into whatever form he may convert them. That is the view of equity, and it is impossible to find any reason in the purpose of the statute to distinguish between the original property and its substitute. We do not wish therefore to imply that it is not enough in every case that the accused has utilized "the channels of interstate commerce to make a successful get-away and thus make the state's detecting and punitive processes impotent."[5] However, we need not go so far in the case at bar; arguendo we may concede that there are goods, procured by means of the property of the victim, whose transportation is not within the statute. Even so, it cannot be seriously argued that, if the accused defrauded his victim of bills of a large denomination and changed them into smaller bills, or vice versa, he would escape; and we recognize no distinction between such a case and the exchange of money from ordinary bank cheques into Travellers cheques.

The next supposed error was the reception of admissions made by the defendant to two agents of the Federal Bureau of Investigation. It is doubtful whether

[2] 2 Cir., 127 F.2d 776, 778.

[3] 2 Cir., 197 F. 511.

[4] Farmer v. United States, 2 Cir., 223 F.R. 903; United States v. Shurtleff, 2 Cir., 43 F.2d 944; United States v. Sprinkle, 2 Cir., 57 F.2d 968, 969; United States v. Reiburn, 2 Cir., 127 F.2d 525.

[5] United States v. Sheridan, 329 U.S. 379, 384, 67 S.Ct. 332, 91 L.Ed. 359.

the defendant meant to object to the competence of this testimony upon the ground which he now argues: i. e. that the admissions were obtained in violation of the doctrine of McNabb v. United States,[6] as expounded in Upshaw v. United States,[7] However, we will assume that the objection was adequate, because we do not find enough in the record to support it in substance. The arrest took place on August 31st at a race-track in a small town in Maryland, called Cumberland. The 31st was a Sunday and the next day was Labor Day; and it does not appear that any commissioner was available before the admissions were obtained on September 2d. In view of the undisputed testimony of one of the agents that he told the defendant that he was free to be silent, if he chose, the testimony was prima facie competent, because the admissions were "voluntary." On the other hand, we read Upshaw v. United States, supra,[7] as holding that, although admissions may be in fact "voluntary," they are nevertheless incompetent, if they are obtained after the time has expired within which the accused should be arraigned, as provided by Rule 5(a) of the Federal Criminal Rules of Procedure, 18 U.S.C.A. That is a separate and independent ground of exclusion; and the critical question here is whether there was a violation of Rule 5(a), and that depends upon whether it was possible to arraign him before a commissioner on Sunday, or on Labor Day. Although it is true that the prosecution offering such a statement must, as a condition of its reception, make affirmative proof that it was "voluntary," the burden of proving that the rule was violated should, we think, rest upon the defendant. Whatever may appear upon another trial, on this record, that was not shown and the testimony was properly admitted.

The fifth and last alleged error was the admission of the testimony of the defendant's wife, Clara Duerr Walker. Nobody disputes that, although there were some exceptions, at common-law a wife's testimony against her husband was incompe-

tent. The only question is whether that doctrine has been changed; and, if not, whether the case at bar is within any exception. In deciding this we must bear in mind two distinct principles: (1) the incompetency of either spouse to testify against the other; (2) the incompetence of either spouse to testify to confidential communications made during marriage. Clara Duerr Walker testified to what the defendant said to her, while courting her before their marriage on June 8, 1945; and she also testified to what he told her thereafter, which, provided it was "confidential," was incompetent on any theory, and indeed would have been even after a divorce.[8] Although no part of what he told her after marriage can be considered as a confidential communication except a letter which he sent her on March 24, 1947, that was, not only "confidential," but extremely damaging. He had shipped her off to live in Alaska, and had left her substantially without money; he had gone through the form of marrying two other women meanwhile, and he was still living with the second of these, preparing to fleece her, as he had fleeced her predecessors. Surely nothing was better calculated to arouse the detestation of the jury than the letter, with its protestations of continued love and its assurances that he was only awaiting the opportunity to be reunited with her. We should find it extremely difficult to write off the admission of this letter as "harmless error" under Rule 52(a), even in a case where the guilt of the accused was so incontestably proved as here. It is true that, when it was offered, the defendant said that he had no objection to its receipt but that must be read in conjunction with his objection at the outset to any testimony whatever of this witness. His assent to the letter only meant that he had no specific objection to it as distinct from his general objection to any of her testimony.

We need not say, however, whether we should have held that its admission was alone enough to compel a reversal of the judgment, because we hold that no part

---

[6] 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819.

[7] 335 U.S. 410, 69 S.Ct. 170.

[8] Wigmore, § 2341(2).

of the testimony of the witness was admissible anyway;[1] and that for that reason the judgment cannot stand. In Yoder v. United States[9] the Tenth Circuit declared that, like her incompetence to testify in her husband's behalf, a wife's incompetence to testify against him had become obsolete and should be abolished; but they did not have to decide the point, because the wife had in fact been divorced, and that made her testimony competent under the old law. A few months later the Third Circuit held the contrary of this dictum,[10] and the Sixth Circuit made the same ruling only a year ago.[11] Thus, the question is still open in point of authority. It is always a debatable question how far any relevant evidence should be privileged. It deprives the party against whom the privilege is invoked of access to the truth; and a disclosure of the whole truth should be the prime concern of a court of justice. Whether in a given situation the interest of the privileged party in suppressing the truth, ought to outweigh that concern would seem to be a matter for Congress, and not for the courts. Moreover, unlike the spouse's disqualification as such[12] this conflict of interest is by no means one-sided, because, although it is not very usual for it to arise unless the spouses are estranged, not all estrangements are final, and nothing could more dispose the privileged spouse to treasure enmity and to repulse any overtures of reconciliation than the memory of what will ordinarily rankle as treachery. Nor is it either practicable or desirable to make the decision dependent upon the judge's conclusion that in the instance before him the marriage has already been so far wrecked that there is nothing to save. That was true, no doubt, here; but we must look beyond the case before us. The question will always arise in the progress of the trial; it must be decided at once; and its answer will introduce a collateral inquiry likely to complicate the trial seriously. The common-law avoided such an inquiry by taking divorce as the only test; and, while the privilege persists at all, there is every reason so to limit the exception. We conclude therefore that we should await the choice of Congress between the conflicting interests involved, or such an overwhelming general acceptance by the states of abolition of the privilege, as induced the Supreme Court to action in Funk v. United States, supra.[12]

We do not forget that a wife from the earliest times was competent to testify against her husband, when the crime was an offence against her person; and we have ourselves extended the exception to the crime of transporting her as a prostitute in interstate commerce,[13] as has the Tenth Circuit.[14] The same exception probably extends to the privilege against the admission of confidential communications.[15] The case at bar is not, however, within this exception, for Clara Duerr Walker was not the victim of the frauds for which the defendant was being tried. The basis of the exception has always been its "necessity";[16] for it was argued that, when the wife was the victim, the prosecution must fail without her testimony. That is not true when her testimony is only corroboratory or confirmatory of an offence against another person, even though it was an offence of the same character as that from which she has herself suffered. That this is true appears at once, if we compare the effect of excluding the testimony of Clara Duerr Walker, had the indictment been for defrauding her of her money, with the effect of excluding it here. In the first case, the prosecution could not have proceeded at all, any more than it could have proceeded here without the testimony of Mary Ashe; but there is no reason to suppose that it could not have secured a conviction in the case at bar, had the Walker testimony been excluded.

Judgment reversed; cause remanded.

---

[9] 80 F.2d 665.

[10] Paul v. United States, 79 F.2d 561.

[11] Brunner v. United States, 168 F.2d 281.

[12] Funk v. United States, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369, 93 A.L.R. 1136.

[13] United States v. Mitchell, 2 Cir., 137 F.2d 1006.

[14] Hayes v. United States, 10 Cir., 168 F.2d 996.

[15] Wigmore, § 2338.

[16] Wigmore, § 2239.

CLARK, Circuit Judge (dissenting).

Admittedly the common-law principle that "a wife cannot be produced either for or against her husband, 'quia sunt duae animae in carne una,'" Co.Litt., f. 6b, 1628, is gone; indeed, there is none now so poor as to do it reverence. But I think we tend to overlook the fact that our duty to interpret "the principles of the common law" in the light of "reason and experience," Federal Rules of Criminal Procedure, rule 26, compels us to discover anew a rational rule, and that a rule looking at least halfway toward the past is itself a new embodiment of the law without, however, the gain of being a real adjustment to modern life. In this instance, therefore, I prefer the forthright approach of a great American judge, McDermott, J., speaking for a unanimous court in Yoder v. United States, 10 Cir., 80 F.2d 665, and placing his decision by preference on this very point.[1]

For present purposes, however, the issue may be narrowed, as it is in the last paragraph of the opinion. For we really have to do with the exception, recognized even at common law, of a wife's testimony as to her husband's crimes against herself. Since it is said quite properly that this exception "probably extends" to the privilege against the admission of confidential communications, 8 Wigmore on Evidence, § 2338, 3d Ed. 1940, I assume no special note need be taken of the defendant's letter of March, 1947, beyond the wife's testimony generally—even if the lack of exception to this bit of evidence is overlooked. And that this was a crime more against the wife's property than her person does not seem to be stressed and is not ground for a sound distinction. 8 Wigmore on Evidence, § 2239, 3d Ed.1940; A. L. I. Model Code of Evidence, Rule 216(c). Hence we find exclusion here limited to the single point that the wife was not the victim of the frauds for which the defendant was being tried. I

submit that this is not a necessary deduction, or one grounded in "reason and experience," from that very vague and troublesome concept so criticized by Wigmore, op. cit., of "necessity." For no attempt is ever made actually to determine whether the wife's testimony is really necessary to the prosecution's (not her) case, as of course none can well be made. Often the testimony of the victim herself may not be absolutely necessary for conviction; on the other hand, testimony of successive defraudings of innocent women, as here, may be the very evidence to place the case beyond dispute. Why should we not face it boldly that this vague label is but one of those judicial flourishes indulged in by judges to cover up a retreat from the impossible position to which Lord Coke's doctrine would otherwise have pushed them?[2]

Should we not therefore turn to the only solid ground—if any—for the exclusion, namely, the promotion of marital peace, etc.? Wigmore, op. cit. But then we must recognize that the reason for the exclusion is now gone entirely, put an end to by the husband's acts. And it will not be a difficult task, or a collateral excursion, for the judge to determine that fact, as did the judge here quite quickly. Certainly it is not any more difficult to conclude that the marriage is already wrecked in such a case than in the one where the prosecutor contemplates making the wife his star witness and frames the indictment accordingly. There seems little difference between the situation where she shows herself ready to testify to the exact charge, and that where, as here, she is ready to support a Chinese copy of it. I think that the judge's ruling below, made after careful hearing and argument, faced modern realities in the spirit invoked in Funk v. United States, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369, 93 A.L.R. 1136, and now embodied as a mandate in F. R. Cr. P. 26. I would affirm.

---

[1] Approved by those courts of last resort, the law reviews: 24 Calif.L.Rev. 472; 4 Duke B. A. J. 107; 35 Mich.L. Rev. 329; 20 Minn.L.Rev. 693; 10 So. Calif.L.Rev. 94. See also Hutchins & Slesinger, Some Reflections on the Law of Evidence; Family Relations, 13 Minn. L.Rev. 675.

[2] It is to be noted that in neither Yoder v. United States, 10 Cir., 80 F.2d 665, nor Brunner v. United States, 6 Cir., 168 F.2d 281, was the wife the victim; nor did discussion turn upon this point in either case.