Percy William **HERMAN**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 6907.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 5, 1955.

Decided March 7, 1955.

George R. Humrickhouse and Robert N. Pollard, Jr., Richmond, Va. (Daniel

Jacobson, New York City, on the brief), for appellant.

James R. Moore, Asst. U. S. Atty., Richmond, Va. (L. S. Parsons, Jr., U. S. Atty., Norfolk, Va., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

Percy William Herman was indicted in two counts, together with one Kathleen M. Nagler, for violation of § 2314 of Title 18 of the Criminal Code of the United States, 18 U.S.C.A. The first count charged that the defendants on March 4, 1954, in the Eastern District of Virginia, unlawfully, knowingly and feloniously transported in interstate commerce from Stafford County, Virginia, to New York City, jewelry of a value of more than $5,000 and money in excess of $5,000, the property of Dyoll Prather Havens, which had theretofore been stolen, converted and taken by fraud as the defendants well knew. The second count charged a conspiracy by the defendants to violate the same statute and set out the commission of a number of overt acts to effect the object of the conspiracy.

The case was tried by a jury as to Herman alone, and upon the completion of the Government's testimony, the judge granted a motion for acquittal on the second count. The case was then submitted to the jury on the substantive charge and the jury found a verdict of guilty and thereafter Herman was sentenced to serve a term of eight years in prison.

Upon this appeal it is not denied that Herman's treatment of Mrs. Havens was indefensible, but it is contended that the judgment should be reversed on the grounds that: (1) the evidence was insufficient to support the charge in the first count of the indictment; (2) evidence of admissions by the defendant were received without independent proof of a corpus delicti; (3) immaterial and inadmissible evidence was received; (4) incompetent evidence was heard by the Grand Jury; (5) prejudicial arguments were made by the United States Attorney; and (6) erroneous instructions were given to the jury by the judge.

The evidence may be summarized as follows: Early in 1954 Herman met for the first time Mrs. Havens, a widow, in an auction gallery in Palm Beach, Florida, where Mrs. Havens resided. He was 49 and she was 67 years of age. Striking up an acquaintance, he offered to light a cigarette for her, followed her when she left the place, accompanied her to her apartment, and upon her invitation entered and had tea. They chatted for a couple of hours and she was so impressed by him that the same evening she accepted his invitation to dinner and to see a movie. At that time and for some months prior thereto Herman had been living in Florida with Mrs. Nagler, an attractive young woman, as man and wife, first at Hollywood Beach in a trailer park, and later in January, 1954, in a cottage at West Palm Beach. Mrs. Havens was not inexperienced. She had been thrice married. She was divorced from her first husband, widowed by the death of her second, and had divorced her third husband in 1953 three weeks after their marriage.

Herman persistently courted Mrs. Havens after their first meeting. He was with her every day for breakfast, luncheon and dinner and for entertainment, and within five days proposed marriage. She did not immediately accept but she did present him with expensive gifts and loaned him large sums of money. He gave her to understand that he was a man of affairs. He told her he was a dealer in gold in Mexico, and had made $70,000 in this business during the previous year. Finally on March 3, 1954, they were married. Prior thereto he borrowed $3,000 from her and used it, together with a Jaguar car of his own, to purchase a new cream colored Cadillac equipped with modern appliances. The arrangement was that on the honeymoon the couple would go to New Orleans for the Mardi Gras, thence to Mexico City, where his business was located, and final-

ly to Honolulu where they would make their home.

Mrs. Havens owned real estate in Florida, which she valued at $300,000. He prevailed upon her to sell it at once for $250,000, promising to make up the difference of $50,000 to her when they arrived in Mexico. The settlement for the real estate, which took place on the wedding day, was in the form of two checks payable to Herman and his bride. He insisted upon cashing the checks and the money, less $6,500 which was paid to an accountant for services rendered to Mrs. Havens, was packed in a suit case which was put in the trunk of the Cadillac; and Herman locked the trunk. Mrs. Herman also owned valuable furs, including a silver mink, reluctantly purchased by her at Herman's request. He packed the furs and said he was shipping them to Mexico to await their arrival. She had not recovered the furs at the time of the trial.

Herman also took valuable jewelry belonging to her from her apartment, telling her he would place it in a safe in his hotel. He promised to give her a $60,000 emerald when he got to Mexico. He told her that he had had a special compartment made for the jewelry in the car.

The bridal couple left Palm Beach at 5 p. m. on the day of the wedding, heading for Washington, where they were to stop at the home of her brother. They drove continuously for 24 hours, stopping briefly three times for meals although the bride was very weary. When they reached a point between Fredericksburg and Quantico in Stafford County, Virginia, late the next afternoon, Herman stated that the money was not safe in the car until the windows of the automobile, which for no apparent reason had been going up and down, were fixed, so they stopped at a roadside hotel and there Herman left his wife with her personal luggage and drove off in the car taking the suitcase containing the money with him. He did not return. His wife waited for him that night and all the next day and night, and then on Saturday morning, March 6, having had no word from him,

proceeded to her brother's home. Later she made contact with the Federal Bureau of Investigation and swore out a warrant for him in Virginia. She heard nothing from him until March 15 when, in response to a telephone call, she went to his lawyer's offices in New York where he had been placed under arrest by the F.B.I.

Herman acknowledged her as his wife, and she felt sorry for him; and on the same day at a preliminary hearing in the office of the United States Commissioner she declined to prosecute him since she did not believe him to be a thief. He was released and for several days they occupied a suite, but not as man and wife, at the Vanderbilt Hotel in New York. He told her that the money and jewelry were safe and that the money was in the safe deposit box of an unnamed lady friend of long standing in whom he had complete confidence.

At that time Mrs. Havens was unaware of the relationship between Herman and Mrs. Nagler. The proof shows that, immediately after leaving his wife in Virginia, Herman rejoined Mrs. Nagler and lived with her as Mr. and Mrs. Nagler in a house she had rented in Scarsdale, New York; and that he had the cream colored Cadillac with him. On March 8 he left the car at a service station in Paterson, New Jersey, where it remained for 26 days. On the same day Herman and Mrs. Nagler left the Scarsdale house and engaged a suite in the Beacon Hotel in New York where they stayed from March 8 to 13. Mrs. Nagler rented a safe deposit box at the hotel. In February or March Mrs. Nagler employed a dress designer to alter two blouses which Mrs. Havens subsequently identified as her own. In March Mrs. Nagler shipped some trunks from New York to San Francisco. In one of them the F.B.I. agent found a large family Bible on the face of which were the words "Prather family". "Prather" was Mrs. Havens' maiden name.

On March 6 Herman telephoned to one John W. Whitmore, a barkeeper in San Francisco, to come to New York to drive

the Cadillac to the west coast. Whitmore came by plane and spent some time in New York at various hotels, including the Esplanado, in company with Herman and Mrs. Nagler. Whitmore was an unwilling witness. He testified, however, that while in New York Herman gave him one or two envelopes which Herman said contained $5,500 in cash, and Whitmore placed the envelopes in a safe deposit box in the hotel.

After Herman was arrested in his lawyer's offices in New York on March 15, he told a special agent of the F.B.I. in answer to a question that the money was in a safe deposit box in the Chase National Bank. He claimed that he had obtained the money legally by a pre-marital agreement and that the money was his; but he added that Mrs. Havens could have her jewelry back. At the hearing before the United States Commissioner Herman again said that the money and the jewelry were in safe deposit boxes in New York City banks and that the F.B.I. had the keys.[1]

After Mrs. Havens learned of Herman's relations with Mrs. Nagler the prosecution of the case was resumed and Mrs. Havens testified before the Grand Jury in Virginia. Subsequently she secured an annulment of the marriage in Florida. She testified that she had never lived with Herman as his wife.

Upon this evidence the defendant contends that a verdict of acquittal should have been directed because the Government offered no proof that the money and jewelry had been stolen or unlawfully converted, but confined itself to the charge that the property had been taken by fraud and yet failed to offer any proof of fraud in that there was no evidence tending to show that Herman's representations as to his financial condition or business activities were false. It is also argued that there was no legal proof that the property was ever in Virginia or in New York and hence no evidence of in-

terstate transportation which is an essential element of the federal crime; and in this connection it is said that the statements of the defendant may not be accepted as sufficient without independent proof of the corpus delicti.

In our opinion these contentions are not tenable. It was clearly shown that the money and jewelry were placed in the car in Florida, that the car was driven thence continuously in Virginia in 24 hours with only short stops for meals, and that in Virginia Herman drove off with the car and its contents, leaving his wife behind with only her personal luggage. His announced intention was to have the windows of the car fixed so that the money would be safe. He was next seen in New York and he had the car with him. In view of this uncontradicted evidence the only reasonable inference is that the property was in the car in Virginia and was taken by the defendant in the car to New York. It is equally clear from the testimony as to the relations of Herman with Mrs. Nagler both before and after his marriage and after he deserted his wife in Virginia and rejoined Mrs. Nagler in New York, that he never intended to fulfill his marriage contract but feloniously intended to steal the money and disappear. Although he got possession of the property with the owner's consent, the technical crime of larceny was made out for it is obvious that the taking was broader than the consent and was made with the felonious attempt at the time to convert the property to his own use. See the authorities cited in 32 Am.Jur., Larceny, § 29.

The charge of fraud in the indictment was proved with equal certainty. Whatever may be the truth as to Herman's position in the business world, it is manifest that his protestation of affection for Mrs. Herman and his marriage vows were prodigies of insincerity given with the deliberate purpose of deceiving his

[1.] The money was actually recovered by the F.B.I. in New York but this fact was not before the jury since the judge ruled that it had been recovered by the F.B.I. as the result of an illegal search.

bride and getting away with her money. They were clearly misrepresentations of fact on the strength of which Mrs. Herman parted with possession of her property.

■ The testimony of Mrs. Mary Shelley Borgeson, which the defendant claims was improperly let in, was clearly admissible. It threw a strong light on Herman's fraudulent intent in dealing with Mrs. Havens. Mrs. Borgeson had previously been swindled by Herman in the same fashion as Mrs. Havens. Mrs. Borgeson met Herman in San Francisco in 1948, shortly after her husband died leaving her an estate of the value of $170,000. Herman managed to meet her by calling her on the telephone and going to her home. Thereafter he continuously pursued her with constant attentions. He expressed great anxiety for the speedy settlement of her late husband's estate and insisted that she get it all in cash, which she did. She fell in love with him and it was agreed that they would marry and go to Acapulco and thence to Honolulu to make their home. He told her he had large holdings in Mexico, gold mines, and was well-to-do. Upon his insistence she secured bonds and cash in the amount of $85,000 from her bank and placed the property in his traveling case with the understanding that he was to call for her at her hotel later the same day; but he did not return. Subsequently after she had taken steps to have him arrested he returned and persuaded her to drop the charges against him and to go away with him. They did not marry but they took several costly trips together at her expense. Except for her share in these expeditions, she never recovered any part of her money.

■ The admissibility and probative force of this testimony are both sustained and illustrated by the ruling of the court in the similar case of United States v. Walker, 2 Cir., 176 F.2d 564, 566, where Judge Learned Hand said:

"The judge admitted the testimony of these witnesses upon the issue of the defendant's fraudulent intent in the transactions charged, under the doctrine that, whenever specific intent is an element in a crime, other transactions of the same kind are relevant to show that the required intent was present upon the occasion in question. The doctrine is general and well established; * *. Such testimony must indeed relate to an occasion near enough in kind to be rationally probative; but in the case at bar the defendant in dealing with Mary Ashe followed the pattern that he had employed in the cases of Clara Duerr Walker and Sally Grehan almost to the letter. The admission of this testimony was plainly right.

"It is difficult to treat seriously the second alleged error: i. e. that there was no evidence to support a finding that the allurements, by which the defendant cajoled Mary Ashe out of her money, were not proved to be false. He appears to suppose that the prosecution failed on this issue, because it did not show in detail that he was not a man of ample means, that he did not own a racing stable with its proper colors, that he had no trust funds, 'tied up' by income tax troubles, that he needed money only for temporary pecuniary relief from his embarrassments, or any of the other lies that he told Mary Ashe. That was not necessary, for the record discloses the trail of a patent swindler, who three times played upon the credulity of single women, fleeced them of all they had, and abandoned them. A jury who did not infer from this history that the enticements were false by which he abused his victims' confidence, would be incompetent to serve at all."

See also Lovely v. United States, 4 Cir., 169 F.2d 386, 388.

■ It is insisted that the court should not have received in evidence the incriminating statements in regard to the presence of stolen property in New York which were made by the defendant

to Whitmore and to the F.B.I. agents and to Mrs. Havens, because admissions of a defendant are not competent to prove a crime without independent substantial proof of the commission of the offense. We have seen, however, that there was independent evidence tending to show the interstate transportation of the property by the defendant with felonious intent, and as we held in Bell v. United States, 4 Cir., 185 F.2d 302, 309, admissions of the defendant may be used if there are corroborating circumstances which fortify the truth of the confessions, although independently they do not establish the corpus delicti, either beyond a reasonable doubt or by a preponderance of proof. It is sufficient if the evidence as a whole proves beyond a reasonable doubt that the defendant is guilty. See Smith v. United States, 348 U.S. 147, 156, 75 S.Ct. 194.

■ The defendant contends that much of the evidence as to the relationship between Herman and Mrs. Nagler, which was pertinent on the conspiracy charge contained in the second count, became irrelevant and prejudicial when the verdict of acquittal on this count was directed by the court, and that the court erred when it refused the defendant's motion to strike this testimony from the record. There is nothing in the point because the long time intimacy between the defendant and Mrs. Nagler which existed when he met Mrs. Havens and was openly resumed as soon as he had run away with the money and jewelry constituted the strongest sort of proof of his unlawful intent. The correctness of the ruling that there was no evidence of conspiracy to submit to the jury may be open to doubt but as to this the defendant has no cause to complain.

Reversal of the judgment is also sought on the ground that the Assistant United States Attorney made prejudicial remarks during the examination of the witnesses and in his closing argument on which account certain motions of the defendant for mistrial should have been granted. Mrs. Havens testified during her cross examination that she gave Herman an engagement ring whereupon his attorney asked her to produce the receipts to show the price paid. The Attorney for the United States interposed to say that the receipts could not be produced because the evidence as to them had been suppressed. He was referring to the order of court suppressing the evidence of the seizure of the money and jewelry in New York; and it is now urged that the defendant was prejudiced by the prosecutor's comment since the jury may have been led to speculate as to what was seized. The defendant's attorney thought so little of the point that he did not ask for a new trial at the time and we think it is hardly worth the effort required to make mention of it.

■ At another time during the examination of Mrs. Borgeson, whom Herman had also victimized, the United States Attorney asked whether Herman used narcotics during his association with her and she replied that he did not except a sleeping pill once in a while and opium on two or three occasions. Motion for mistrial was thereupon made by the defendant and denied; but the judge told the jury that the testimony had no bearing on the case and admonished it to disregard it. He repeated this caution in his charge. We think that this handling of the incident was correct and that the grant of a mistrial on account of it would have been entirely unnecessary and unreasonable.

■ Again it is objected that the prosecutor was guilty of prejudicial conduct in his closing argument by describing the defendant as "a living fraud"— "a living lie", and by pointing out that none of the testimony of the witnesses for the Government had been denied. There was no error in these incidents. The characterization of the defendant on the basis of the evidence before the jury was so accurate as to admit of no justifiable criticism; and the United States Attorney was entirely within his right in commenting upon the fact that the evidence of the Government was undisputed, since he did not comment on the failure

of the defendant to testify. See Banks v. United States, 8 Cir., 204 F.2d 666, 672.

The defendant requested the judge to instruct the jury that in order to convict on the first count they must find that he transported both money of a value of $5,000 or more and jewelry of a value of $5,000 or more. But the judge told the jury that they should convict if they found that property consisting of money or jewelry of the value of $5,000 or more was transported in interstate commerce. The indictment was phrased in the words of the statute and sufficiently advised the defendant of the charge against him; and although it was charged that the defendant transported both money and jewelry, proof of the transportation of either kind of property was sufficient to support the verdict of guilty. See Harris v. United States, 4 Cir., 140 F.2d 567, 568.

Finally it is urged that the trial court erred in refusing the defendant's motion to dismiss the indictment on the ground that it was based on the testimony before the Grand Jury of Mrs. Havens who at the time was still Herman's wife. We find no error in this ruling. The ancient and outworn rule of common law that spouses are incompetent to testify against each other except in cases of personal violence has been relaxed in the federal courts. The change in the rule was given momentum by the opinion of Mr. Justice Sutherland in Funk v. United States, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369, in which it was decided that in the federal courts the wife of a defendant in a criminal case was a competent witness in his behalf. It was held that the federal courts, although powerless to amend a rule of the common law, have the power and duty to disregard an old rule which is contrary to modern experience and thought and is opposed in principle to the general current of legislation and judicial opinion. Subsequently the courts applied this principle to cases under the Mann Act, 18 U.S.C.A. §§ 2421–2423, so as to permit a wife to testify against her husband charged with transporting her for purposes of prosti-

tution. See Shores v. United States, 8 Cir., 174 F.2d 838, 11 A.L.R.2d 635. Moreover, it has been held in United States v. Graham, D.C.E.D.Mich., 87 F. Supp. 237, a case precisely like that at bar, that a wife can be a witness against her husband not only when personal injury to her of a physical or moral nature is claimed, but also where the crime affects her property. We are in complete accord with this view which marks a normal development of the law of evidence and is in harmony with Rule 26 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., which provides in effect that the admissibility of evidence and the competency of witnesses shall be governed, except when an Act of Congress otherwise provides, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

Affirmed.