UNITED STATES of America, Appellee,

v.

Louis J. POMPONIO, Jr., Peter Pomponio and Paul Pomponio, Appellants.

UNITED STATES of America, Appellee,

v.

Louis J. POMPONIO, Jr., Appellant.

Nos. 76–1485, 76–1885.

United States Court of Appeals, Fourth Circuit.

Argued June 9, 1977.

Decided July 27, 1977.

Leonard B. Boudin, New York City (Victor Rabinowitz, Michael Lee Hertzberg, Eric M. Lieberman, Rabinowitz, Boudin & Standard, New York City, on brief), for appellants.

Frank W. Dunham, Jr., Joseph A. Fisher, III, Asst. U. S. Attys., Alexandria, Va. (William B. Cummings, U. S. Atty., Robert F. McDermott, Jr., James R. Hubbard, Asst. U. S. Attys., Stephen M. Weglian, Jr., Trial Atty., Crim. Div., U. S. Dept. of Justice, Washington, D. C., on brief), for appellee.

Before WINTER, BUTZNER and WIDENER, Circuit Judges.

BUTZNER, Circuit Judge:

Louis J. Pomponio, Jr., appeals from a judgment convicting him of violating the National Stolen Property Act, 18 U.S.C. § 2314, which proscribes the interstate transportation of counterfeit securities and securities taken by fraud. Though he assigns numerous errors, only two merit discussion. First, Pomponio claims that the stock certificates he is charged with transporting were not counterfeit. Second, he alleges that the cashier's check in issue was not "taken by fraud" within the meaning of the statute. We affirm the district court's judgment.

I

In October, 1970, Pomponio and his two brothers pledged to Jerome S. Murray all of the stock of the Zachary Taylor Corporation, represented by certificates numbered 1, 2, and 3, as collateral for the performance of an obligation of another Pomponio corporation.

In June, 1971, Pomponio pledged the same stock to John McShain without securing a release from Murray. He accomplished this by buying another stock book, issuing certificates 1, 2, and 3 from the new book, sending them from Virginia to McShain in Pennsylvania, and again representing that these certificates were all of the stock of the Zachary Taylor Corporation.

Upon receipt of the pledged stock, McShain endorsed a promissory note executed by Pomponio and his brothers payable to the Continental Bank in the amount of $3,800,000. Relying on McShain's endorsement, the bank issued a cashier's check for $2,000,000 to the Pomponios and held the balance of the loan in an escrow account. Pomponio then carried the check from Pennsylvania to Virginia.

II

Title 18 U.S.C. § 2314 provides in part: "Whoever, with unlawful or fraudulent intent, transports in interstate . . . commerce any . . . counterfeited se-

curities . . . knowing the same to have been . . . counterfeited" shall be fined, etc.

 The evidence discloses that Pomponio acted with fraudulent intent and that he caused the stock certificates to be transported in interstate commerce.[1] Therefore, his assignments of error with respect to these elements of the statute need no extended discussion. A more difficult question is raised by his contention that the certificates were not counterfeit.

The record establishes that Pomponio and his brothers were the sole stockholders, officers and directors of the Zachary Taylor Corporation. The corporation's charter and by-laws and the law of the state of incorporation conferred on them the power to issue stock. Pomponio contends that these undisputed facts establish that the certificates were not counterfeit. He bases his defense on cases that draw a distinction between making a false and fraudulent statement in a document, which is not punishable under the statute, and making a spurious or fictitious document, which is punishable as a forgery. *See, e.g., Gilbert v. United States*, 370 U.S. 650, 82 S.Ct. 1399, 8 L.Ed.2d 750 (1962); *Marteney v. United States*, 216 F.2d 760 (10th Cir. 1954); and *Greathouse v. United States*, 170 F.2d 512 (4th Cir. 1948). Pomponio argues that although the stock certificates may have represented 50% of the stock of the corporation rather than 100% as he had claimed, such a misrepresentation, even if fraudulent, does not make them counterfeit.

The difficulty with Pomponio's position is that he did much more than make a fraudulent misrepresentation to McShain about the pledged certificates. To allay suspicion, he purchased another stock book and simulated the original certificates pledged to Murray by numbering the new certificates 1, 2, and 3.

*United States v. Smith*, 318 F.2d 94, 95 (4th Cir. 1963), observes that " 'Counterfeited' means imitated, simulated, feigned or pretended." In *United States v. Anderson*, 532 F.2d 1218, 1224 (9th Cir. 1976), the court quoted as a frequently approved definition of counterfeit "an imitation of a genuine document having a resemblance intended to deceive and be taken for the original." In light of these definitions, we conclude that Pomponio counterfeited his corporation's original stock certificates numbered 1, 2, and 3 by executing a second set of certificates bearing the same numbers. Consequently, he violated the Act when he caused the counterfeit securities to be transported in interstate commerce.

### III

 Title 18 U.S.C. § 2314 also provides in part: "Whoever transports in interstate . . . commerce any . . . securities . . . knowing the same to have been . . . taken by fraud" shall be fined, etc.

The government charged that Pomponio violated this statute when he carried the Continental Bank check from Pennsylvania to Virginia. It asserts that McShain was the principal victim of Pomponio's fraud and acknowledges that the bank was not defrauded because it obtained all that it sought—McShain's valid endorsement on Pomponio's promissory note.

Pomponio insists that the statute requires that the person from whom the security is "taken" be the victim of the fraud. Accordingly, he contends that because the bank was not defrauded, the check was not "taken by fraud" within the meaning of the statute. He argues that, at most, the endorsement on the promissory note was "taken by fraud," but that note did not travel in interstate commerce and cannot be the basis for conviction.

---

1. Pomponio was also charged with violating 18 U.S.C. § 2, which provides:

 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

We believe § 2314 was not meant to be applied so restrictively. The plain language of the Act does not impose any requirement that the security transported in interstate commerce be taken directly from the person who was defrauded. The imposition of such a requirement by judicial gloss would defeat the purpose of the Act. In *United States v. Sheridan*, 329 U.S. 379, 384, 67 S.Ct. 332, 335, 91 L.Ed. 359 (1946), the Court emphasized that Congress enacted the statute to facilitate federal-state cooperation in apprehending and punishing criminals who utilize the channels of interstate commerce. In explanation of congressional intent the Court said:

> Congress had in mind preventing further frauds or the completion of frauds partially executed. But it also contemplated coming to the aid of the states in detecting and punishing criminals whose offenses are complete under state law, but who utilize the channels of interstate commerce to make a successful getaway and thus make the state's detecting and punitive processes impotent. This was indeed one of the most effective ways of preventing further frauds as well as irrevocable completion of partially executed ones.

This broad interpretation of the statute was applied in *United States v. Walker*, 176 F.2d 564 (2d Cir. 1949). Walker fraudulently induced his victim to mortgage her property and give him the proceeds in the form of checks. He then cashed these checks and purchased travelers checks, which he carried from Texas to New York. Walker's defense was substantially the same as Pomponio's. He argued that even conceding that he took the mortgagee's checks from the victim by fraud, "he did not violate the statute, because he did not carry either of them with him from Houston to New York." 176 F.2d at 566.

Rejecting Walker's defense, Judge Learned Hand wrote:

> We are by no means prepared to hold that, whenever any one fraudulently ob-

tains the property of another, the proceeds are not also "taken feloniously by fraud", into whatever form he may convert them. That is the view of equity, and it is impossible to find any reason in the purpose of the statute to distinguish between the original property and its substitute.

176 F.2d at 566.

Pomponio's conduct was strikingly similar to Walker's. In both instances the fraudulent acts—the procurement of an endorsement and the inducement to execute a mortgage—did not immediately involve interstate transportation. Moreover, the banks issuing the securities that were transported were not the victims of the fraud.

*Sheridan* and *Walker* fully sustain Pomponio's conviction. His procurement of McShain's endorsement was an essential step—albeit a preliminary one—toward receiving the proceeds of the loan from the bank in the form of a cashier's check. Pomponio did not consummate his fraudulent scheme until he gained possession of the cashier's check. It is therefore apparent that the check was literally taken by fraud.[2] By transporting the check from Pennsylvania to Virginia Pomponio violated the statute.

We find no cause for reversal in Pomponio's other assignments of error.

*Affirmed.*

---

**2.** Webster's Third International Dictionary (1961 ed.) defines "take" as: "to get into one's hands or into one's possession, power, or control by force or stratagem . . . ."