575 P.2d 826

**STATE of Arizona, Appellee,**

**v.**

**Robert H. KEY, Appellant.**

**No. 1 CA–CR 2770.**

Court of Appeals of Arizona,
Division 1,
Department A.

Feb. 16, 1978.

Bruce E. Babbitt, Arizona Atty. Gen. by William J. Schafer, III, Chief Counsel, Crim. Div., and Kenneth W. Seidberg, Asst. Atty. Gen., Phoenix, for appellee.

Peter Deambrogio, Phoenix, for appellant.

## OPINION

NELSON, Judge.

Appellant, Robert Key, was convicted following a jury trial of receiving stolen property, A.R.S. § 13–621. The court suspended the imposition of sentence for five years and placed appellant on probation on condition that he make restitution at the rate of $200 per month. Appellant thereafter perfected this appeal.

On July 11, 1975, David Hvidsten, a Tucson real estate investor, traveled to Phoenix to talk to Donald Kephart. Kephart had purchased some property in Tucson from Hvidsten and had been late in making payments. Hvidsten wanted to collect the money that Kephart owed him.

They met at Kephart's home and proceeded from there to Kephart's office at Overland Financial and Newport Trust on North Central Avenue in Phoenix. After their arrival, Kephart busied himself with other matters and Hvidsten used the time to conduct some business by telephone. Also present at the office were Charles Wilkins, Carl and Carole Nickelson, the secretary and appellant.

Kephart introduced Hvidsten and appellant and they began discussing a real estate transaction involving a shopping center and apartment complex in Phoenix. After several hours of discussion Hvidsten decided to offer $5,000,000 for the property, contingent on his inspection of the property and all accounting statements. The offer was reduced to a purchase contract and receipt and Hvidsten agreed to put $20,000 down in earnest money. He wrote a personal check in that amount with Minnesota Title Insurance Company as payee. Hvidsten testified that he then gave the check to appellant. The understanding was that the check would be returned if the deal fell through.

Appellant, Kephart, Wilkins and the Nickelsons were in fact partners and corporate officers in both Overland Financial and Newport Trust. They would have shared in any commission received from the sale of the shopping center and apartment complex to Hvidsten. Appellant presented the offer to the seller, who agreed to accept the contract but refused to pay the commission of $500,000. They therefore decided to raise the selling price by that amount but Hvidsten, upon learning from Carl Nickelson of the increase, told them it was unacceptable.

Thereafter Hvidsten made numerous fruitless efforts to retrieve the $20,000 check which he had put down as earnest money. He contacted appellant several times but was told by appellant that he felt

no obligation to return the earnest money because the "deal was dead". Appellant told Hvidsten on one occasion that he had seen the check "floating around" Overland Financial. Finally, appellant told Hvidsten that he had given the check to Kephart.

Kephart testified as a witness for the State after a negotiated plea of guilty and related that three weeks after the earnest money check was written, he took it from a desk drawer in the office and exchanged it for a cashier's check at the First National Bank downtown. Appellant was aware that this exchange was made. Kephart's purpose in doing this was to clear the money out of Hvidsten's personal account so that he could apply leverage on Hvidsten with regard to his late payments on the Tucson property. When he returned to the office with the cashier's check, Kephart noticed that Hvidsten's name as remitter had been left off the check. Kephart then engaged in a discussion with appellant, the secretary, Charles Wilkins and Carl Nickelson about how they could split the money if the cashier's check could be converted into cash. To this end, Wilkins and Kephart conceived a plan which was carried out over the next few days.

Kephart and Wilkins took the check to a branch office of Minnesota Title where they opened up an escrow account and deposited the cashier's check on behalf of Utopia, Inc. The cashier's check was ostensibly earnest money and a down payment on some property that Utopia, Inc. was purchasing from Newport Trust. Appellant, Kephart, Wilkins and Carl Nickelson were the incorporators of Utopia, Inc. They had filed the articles of incorporation but had not received a charter. A board meeting for the election of officers had never been held and no stock was ever issued. They had planned originally to use Utopia, Inc. as a company to hold any assets any of the four of them received, but at the time of this transaction, Utopia, Inc. was not doing business. The real estate transactions between it and Newport Trust, which as noted earlier was also the creation of these four individuals, was a non-existent transaction conceived for the sole purpose of opening the escrow account.

A couple of days after the cashier's check was deposited in the escrow account, Kephart called Minnesota Title and told them that there were some problems with the land that Utopia was purchasing and that he preferred to keep $19,000 of the escrow account in an interest-bearing account while the problems were worked out. Kephart had Minnesota Title draw up an addendum to the original escrow instructions to this effect. Kephart and Wilkins went in and signed the addendum on behalf of Utopia. Kephart then received a check for $19,000 with Minnesota Title as payor and Utopia, Inc. as payee. Kephart testified that he asked for $19,000 because he was afraid that if he had asked for $20,000 they might have merely given him the $20,000 cashier's check. He also testified that appellant was informed of the progress of the transaction as it unfolded.

After receiving the $19,000 check from Minnesota Title, Kephart went to a United Bank office, where the check was exchanged for another cashier's check payable to Utopia, Inc. Wilkins and Kephart then went to the home office of the Valley National Bank, where they opened a checking account for Utopia, Inc. and deposited the $19,000 cashier's check from United Bank. Using one of the initial temporary checks for the Utopia account, Kephart and Wilkins immediately wrote a check on the new account to cash for $12,500, and another check for $4,500 payable to Kephart. They cashed the $12,500 check and were given the cash in a brown paper bag. They carried the cash back to the office where they dumped it out on the secretary's desk. Appellant took $4,000 from the pile and pocketed it.

Appellant argues on appeal that the State failed to prove that the $4,000 which he received was stolen property. One of the elements of the offense of receiving stolen property is that the property received must have been actually stolen. *State v. Vitale*, 23 Ariz.App. 37, 530 P.2d 394 (1975); *State v. Carner*, 25 Ariz.App.

156, 541 P.2d 947, n.1 (1975). Appellant reasons that the property that was stolen was the $20,000 personal check written by Mr. Hvidsten and deposited with appellant as earnest money. The property which appellant actually received was not the personal check but United States currency which was never reported stolen by Valley National Bank but was rather withdrawn from the corporate checking account of Utopia, Inc.

 In our view, appellant has adopted a hyper-technical view of the transactions set forth in the statement of facts. In fact, the object of all of Kephart's maneuvering after the original $20,000 personal check was converted into a $20,000 cashier's check was the acquisition of the cash it represented.

Kephart testified as follows:

"Q. BY MR. SEIDBERG: Would you repeat for us who was present at the time that these discussions and conversations were held?

A. August 4?

Q. Yes.

A. Jeanne Johnson, Bob Key, Charles Wilkins, Carl Nickelson and myself.

Q. Did you know a conversation was held regarding the $20,000 cashier's check?

A. Yes.

Q. Did Bob Key participate in that conversation?

A. Yes.

* * * * * *

Q. What was said at that conversation?

A. That if we could convert the cashier's check to cash that it would be split in some manner.

Q. How would it be split?

A. $4,000 to Mr. Key, $4,000 to Mr. Wilkins, $4,000 to Mr. Nickelson and $6,000 to myself, leaving $2,000 to pay attorney's fees if any civil action may come up of this transaction.

Q. Were there any other conversations or discussions?

A. Only that if any criminal prosecution were to come up that each and every one of us would return the amount that we received.

Q. So it was actually discussed what would be done if there was a civil lawsuit or criminal prosecution?

A. That is correct.

Q. Did Bob Key participate in that discussion?

A. Yes, he did."

The theft was therefore incomplete until the cash, the object of their felonious desires, was handed over to Wilkins and Kephart by the teller at the Valley National Bank.

In *People ex rel. Briggs v. Hanley*, 226 N.Y. 453, 123 N.E. 663 (1919), a clerk employed in the transfer department of a New York trust company fraudulently obtained possession of and forged the necessary signatures to some corporate stock certificates. The certificates were then used as collateral for three loans totaling $100,000 obtained from a company in Philadelphia. The complete transaction was accomplished by mail. The clerk mailed the certificates and promissory notes to the company in Philadelphia, which then through correspondent Philadelphia banks placed $100,000 to the credit of the clerk in the Knickerbocker Trust Company of New York. The clerk's mistress, who knew all the details, then received $21,000 in cash drawn from the credit at Knickerbocker Trust. The Court of Appeals of New York concluded that the woman had received stolen property, reasoning that it was a stolen credit, and that the money drawn from the trust company as a result thereof was stolen money. The court noted further that:

"Her act in receiving the money and appropriating it to her own use brought her fairly within the meaning of the statute. In criminal as well as civil cases the law looks to substance, and not to form." 123 N.E. at 664.

A case of similar import is *United States v. Walker*, 176 F.2d 564 (2nd Cir. 1949), *cert. denied*, 338 U.S. 891, 70 S.Ct. 239, 94 L.Ed. 547, which involved a prosecution under the National Stolen Property Act, 18 U.S.C.

§ 2314 [then § 415]. The defendant, who was already married, had married another woman from Houston who owned a large warehouse. He first persuaded her to mortgage and then to sell the warehouse, each time giving him the proceeds. On each occasion she gave him a check which he converted into cash, traveler's checks and other checks. The essence of the two counts against him was that he transported the stolen property from Houston to New York in the form of traveler's checks. One of his arguments on appeal was that he did not violate the statute because he did not transport either of the original checks handed him by his wife. Judge Learned Hand rejected the argument:

> "We are by no means prepared to hold that, whenever any one fraudulently obtains the property of another, the proceeds are not also 'taken feloniously by fraud', into whatever form he may convert them.
>
> \* \* \* \* \* \*
>
> . . . [I]t cannot be seriously argued that, if the accused defrauded his victim of bills of a large denomination and changed them into smaller bills, or vice versa, he would escape; and we recognize no distinction between such a case and the exchange of money from ordinary bank cheques into Travellers cheques." 176 F.2d at 566.

For more recent application of the *Walker* decision, *see United States v. Pomponio*, 558 F.2d 1172 (4th Cir. 1977).

 Appellant would have us adopt an extremely restrictive interpretation of the requirement that the property received must be stolen. Such an interpretation would do violence to the purpose of the statute. If we adopted appellant's view, it would require us to ignore the fact that the purpose of Kephart's maneuvering was to obtain the cash which he laid on the table. The partners did not want the check because it was useless to them in that form. The felonious scheme was not completed until the cash was obtained from the bank. *See United States v. Pomponio, supra.* The cash which appellant later received was,

therefore, the stolen property and the requirement of A.R.S. § 13–621 that the property received be actually stolen was met.

The judgment of conviction and the sentence thereon are affirmed.

HAIRE, P. J., and FROEB, C. J., concur.