UNITED STATES of America,
Plaintiff–Appellee,

v.

Richard Taylor CARDALL,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Barry CROWTHER,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Joseph A. HOLMAN,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Stanley L. WILLMITT,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Gerald L. TURNER,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Farrell ANDERSON,
Defendant–Appellant.

Nos. 87–1582, 87–1587, 87–1589, 87–1592, 87–1594 and 87–1625.

United States Court of Appeals,
Tenth Circuit.

Sept. 6, 1989.

Rehearing Denied Oct. 19, 1989.

Craig S. Cook, Salt Lake City, Utah (Edward T. Wells, Salt Lake City, Utah, with him on appellant's brief-in-chief), for defendant-appellant, Richard Taylor Cardall.

William W. Downes, Jr., Houpt, Eckersley & Downes, Salt Lake City, Utah, for defendant-appellant, Barry Crowther.

Randall Gaither, Salt Lake City, Utah, for defendant-appellant, Joseph A. Holman.

James N. Barber, Salt Lake City, Utah, for defendant-appellant Stanley L. Willmitt.

Sumner J. Hatch, Salt Lake City, Utah, submitted on the briefs for defendant-appellant, Gerald L. Turner.

Edwin F. Guyon, Salt Lake City, Utah, for defendant-appellant, Farrell Anderson.

Mervyn Hamburg, Atty., Dept. of Justice, Washington, D.C. (Brent D. Ward, U.S. Atty. for D. Utah, with him on the brief), for plaintiff-appellee.

Before McKAY, SETH and SEYMOUR, Circuit Judges.

McKAY, Circuit Judge.

Defendants Richard Taylor Cardall, Barry Crowther, Joseph A. Holman, Stanley L. Willmitt, Gerald L. Turner, and Farrell Anderson appeal their convictions for mail fraud, wire fraud, the interstate transportation of money taken by fraud (ITSP), bankruptcy fraud, and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO).

## I.

In order to facilitate our analysis, we first outline the scheme to defraud and the interrelated entities and individuals involved.

### A. *Entities.*

1. *FSI:* Fiscal Services, Inc. (FSI) operated between 1979–80 as a payables "factoring" company[1] located in Salt Lake City, Utah. Although FSI was not the target of this indictment and trial, it was a predecessor company to the "clearing house operation," which is the subject of this trial.[2] During trial, the prosecution

---

1. A payables "factoring" company earns its income by soliciting client companies ("payable companies") to surrender their accounts payable and sufficient funds to pay them to the factoring company. The factoring company negotiates discounts with the creditors for early payment, then pays the bills early. The company's profit is the difference between the full billing amount and the discounted payout. The factoring company splits the profit with the client payable company.

2. The parties spent considerable time arguing whether the evidence concerning FSI and the clearinghouse operation indicated the existence of one or two schemes operating between 1979–81. Although resolution of this issue is not necessary to our disposition, we believe that despite the organizational and personnel changes which took place over the three-year period, all of the entities were part of one continuing scheme.

offered extensive evidence of the fraudulent operation of FSI under Fed.R.Evid. 404(b) in order to show pattern or plan in this fraudulent scheme.[3]

2. *The Clearinghouse Operation:* The clearinghouse operation consisted of an interrelated collection of payables factoring and consulting companies—International Clearing House, Universal Clearing House, Business Consultants, Inc., Payable Accounting Corporation, and Accounting Services Company.

3. *FAS/BCI:* Fiscal Advisory Services (FAS), which also operated between 1979–80, was the predecessor company to Business Consultants, Inc. (BCI). In 1980, BCI was organized to act as a consultant to and handle accounting and related services for the clearinghouse operation. In exchange, BCI received two percent of the funds channeled through the clearinghouses.

4. *Clearinghouses:* General Clearing House and National Clearing House, two California-based "clearinghouses," formed an integral part of the fraudulent scheme. In 1980, they were served with a cease and desist order which was later made enforceable in Utah. As a result, the operations were renamed, respectively, Universal Clearing House (UCH) and International Clearing House (ICH), and Salt Lake City became the new base of operation.

### B. *The Scheme.*

After its organization, FSI solicited payable company clients with promises that they would receive substantial revenues from a combination of creditor discounts and investments from tax-free revenue bonds.[4] FSI also solicited prospective clients by leading them to believe that a number of well-known businesses "factored" their accounts payables through the company entities.[5] By mid–1980, FSI was phasing out. It was not soliciting new clients, and old clients began making demands for reimbursement. FSI occasionally satisfied demands for payment with investor funds from the successor clearinghouse operation.

About the time that FSI was phasing out, FAS underwent a name change and shift in emphasis, emerging as BCI. Although the payables factoring program ostensibly remained the cornerstone of the operation, FAS introduced the concept of "undertakers" to the scheme. Undertakers were individual investors who were told that their investments would be used to fund the payments of the payables side of the operation. In exchange, the undertakers were promised an extraordinarily high rate of return (the equivalent of a ninety-six percent annual rate) on their investments. Through the use of an expanded sales program,[6] over 5,300 undertakers in a

---

**3.** The prosecution offered FSI evidence over a period of approximately seven days in the course of a five-month trial. Thirty-four witnesses testified about FSI, and the prosecution admitted 100 exhibits. In all, FSI evidence covers over 900 pages of a 15,000–page trial transcript.

**4.** According to FSI client contracts, FSI promised to purchase tax-free bonds with the money forwarded by the client companies for payment of their creditor's accounts. In reality, no bonds were ever purchased, accounts frequently went unpaid (or payment checks were returned due to insufficient funds), and the money received from client companies was diverted into high-risk projects which were not disclosed to investors.

**5.** For example, FSI told clients that Gerber Baby Food, Mountain Bell, Sears, and large utility companies were FSI clients. In reality, however, only a handful of primarily local businesses ever signed on with FSI.

**6.** The operation developed an undertaker sales presentation, and all sales personnel were required to learn and use it without deviation in presenting the program to prospective undertakers. The record indicates that the sales presentation was essentially the same as that previously used by FSI, with minor modifications directed at increasing undertaker investment. After the presentation, the salesman asked the prospective undertaker to sign two documents: a sales contract and a "Commitment to Assume Debt." The language contained in the document was not always consistent with the oral representations of the sales personnel. Specifically, while undertakers were told that their money would be used strictly for payment of the debt of companies in the payables program, the documents contained a paragraph that conferred discretion to use the undertakers' funds for other purposes. However, the documents also assured the undertakers that their investments would be secured.

number of states eventually invested in excess of $30 million in the clearinghouse operation.

Representations by sales personnel notwithstanding, the payables portion of the program was virtually nonexistent.[7] No one was assigned to develop such a program, and when sales staff asked the principals to identify the payable companies, they refused to do so.[8] Moreover, when sales personnel indicated that they had prospective clients for the payables program, they were rebuffed.[9] Because there was no viable payables program, the payables side of the operation could not generate any income from payables discounts. Absent another source of income to service earnings payments, the operation made payments from funds received from subsequent undertaker investors.

In addition, the principals diverted undertaker funds to a number of high-risk ventures including land, mining, gold, silver and oil. There was also an abortive attempt to enter the reinsurance business through offshore enterprises. Additionally, clearinghouse funds were diverted for the private use of clearinghouse principals and their families.[10]

By August 1981 the financial house of cards was beginning to collapse and undertakers failed to receive their monthly "earnings" checks. Sales personnel were told that the lack of immediate funds was due to a combination of regulatory agency

harassment, two unsuccessful short-term investments, and the failure to receive a wire transfer of funds from abroad. The operation prepared and distributed a letter to clearinghouse undertakers representing that there were ample assets to cover the principal and earnings due to all investors. The letter assured investors that contract provisions which guaranteed the protection of undertaker investments would be met. Despite missed payments, sales of undertaker contracts continued, although demands for early repayment of undertaker investments were rejected.

In the meantime, the principals discussed the prospect of filing a Chapter 11 petition under the Bankruptcy Code in order to protect the clearinghouses from civil lawsuits to "buy time" for liquidating assets to pay undertakers. Disagreement over this proposed solution eventually led to the disassociation of one of the appellants from the enterprise. The bankruptcy petitions were filed on September 16, 1981. That same evening, FBI agents armed with warrants conducted a search of the BCI/clearinghouse offices.[11]

### C. *Appellants.*

#### 1. Richard Taylor Cardall

Appellant Cardall masterminded the creation of various inter-related entities involved in the scheme. Although Mr. Car-

---

**7.** In mid–1981, a certified public accountant who had been hired to update accounting records determined that only two companies participated in the clearinghouse program. Neither of them regularly furnished funds or monthly invoices for payment.

**8.** Sales personnel were told to refer to the payable companies as "ABC companies" in their sales presentation. Supposedly, participating companies desired anonymity so they would not be barraged with requests for information.

**9.** Various reasons were given for refusing new clients; for example, the prospect's accounts payable was under $100,000 per month, or that a sufficient number of companies were already on the plan and a waiting list existed. One salesperson offered to place his own business in the payables program but was told that no new ABC companies would be added until a new computer program was in place. The operation

also refused out-of-state inquiries in the payables program.

**10.** For example, Mr. Cardall used clearinghouse funds to make a down payment on a house for his daughter, to purchase an automobile for his son and a Salt Lake condominium for his father. Other real estate purchases were made with clearinghouse funds for the benefit of Mr. Willmitt and his daughter. Finally, a number of luxury vehicles were also purchased with clearinghouse funds for Messrs. Holman, Cardall and Crowther.

**11.** When they arrived, the agents saw Mr. Cardall and his secretary leaving the building with boxes. They placed them in Mr. Cardall's car and he drove off. The agents stopped the car and retrieved the boxes which contained numerous documents related to the clearinghouse business operations.

dall was responsible for developing and implementing the scheme and creating the various entities, he was rarely identified as a principal in those ventures.[12] Nevertheless, it is clear that he retained control of the operations, evidenced by his hiring of an FSI salesman whom he later installed as FSI's president. FSI and the clearinghouses identified Mr. Cardall as a "consultant" and paid him fees for his "services".

At Mr. Cardall's instigation, clearinghouse sales personnel were misinformed concerning the existence of ABC companies. He also fraudulently represented the existence of clearinghouse assets[13] and prospective purchasers for the Mexican land deal he had organized.[14]

### 2. Joseph A. Holman

Appellant Holman served as office manager for FAS and as vice president of FSI from its organization until August 1979. Thereafter, Mr. Holman became office manager to BCI, FAS's successor firm. As office manager, Mr. Holman transferred money out of the business accounts, received undertaker contracts, and handled payments from undertaker-investors. Although other individuals had signature authority, Mr. Holman had access to, and control of, facsimile signature stamps which were used in issuing checks on the company's accounts. Mr. Holman also served as a conduit of information between other defendants and sales personnel, and was the person responsible for distributing the misleading August 1981 letter to investors at the time of the clearinghouse default on earnings checks.

### 3. Gerald L. Turner

Appellant Turner became counsel for FSI in 1979 and met with prospective clients on FSI's behalf. As FSI's attorney, Mr. Turner made representations about the viability and success of the payables program. He also represented the successor companies in bankruptcy. After the bankruptcy judge ordered the freezing of clearinghouse accounts but before the bank holding the funds had received notice of the order, Mr. Turner arranged to have $70,000 in checks drawn on clearinghouse accounts cashed and the funds transferred to his business account at another bank.

### 4. Barry Crowther

Appellant Crowther joined Mr. Cardall's clearinghouse operations in 1980 and participated heavily in its day-to-day operation. Mr. Crowther signed the signature card to open a clearinghouse bank account in Colorado, later closing it and receiving the account balance in the form of cashier's checks. During his involvement with the clearinghouse operation, Mr. Crowther falsely represented to sales personnel that certain businesses were participants in the payables program. Mr. Crowther disassociated himself from the clearinghouse operations sometime in late August or early September 1981 because he disagreed with other principals on the advisability of bankruptcy.

### 5. Stanley L. Willmitt

Appellant Willmitt, a California-based Cardall associate, assisted Mr. Cardall in a plan to establish five offshore reinsurance companies, in the failed land development project in Mexico, Bahia Kino, and in cer-

**12.** For example, when FSI was incorporated, three other individuals (including appellant Holman) were named as president, vice president, and secretary-treasurer. Later on, the operation abandoned certain oil company investments because Mr. Cardall refused to be identified to the Securities and Exchange Commission as the "promoter" of those ventures.

**13.** In anticipation of filing the bankruptcy petition, lawyers and accounting staff prepared schedules outlining the value of clearinghouse assets. These schedules were based primarily upon information furnished by Mr. Cardall; re-

lying on this information, "values" in the millions of dollars were assigned to various assets.

**14.** For example, during September 1981, Mr. Cardall conducted a meeting in which he falsely represented that there was a buyer for a land development project known as Bahia Kino, and that funds from the project's sale would take care of the clearinghouse operation debts. At that same meeting, Mr. Cardall ordered those present not to speak with representatives of federal agencies, and warned that anyone who did would be removed from the "inside" group.

tain oil ventures. Mr. Willmitt and Mr. Cardall diverted thousands of dollars in investor funds to these projects. Mr. Willmitt traveled with Mr. Cardall to Germany, Mexico and Great Britain, and participated in fraudulent efforts to "market" the Bahia Kino project even after he became aware that Mr. Cardall was contemplating placing the operations in bankruptcy.

### 6. Farrell Anderson

Appellant Anderson joined BCI in May 1981 to work on the proposed reinsurance enterprises being organized by Messrs. Cardall and Willmitt in the Cayman Islands. The project never reached fruition because the clearinghouses were nearly bankrupt and could not provide the minimum capitalization amount required by law. Mr. Anderson deposited clearinghouse funds in a money market account that he had opened in his brother's name, later drawing on that account and depositing the drawn funds into an account which he controlled.

### D. *Indictments and Trials*

A forty-nine count superseding indictment was filed on October 26, 1983,[15] charging twelve individuals, including the six appellants, with mail fraud, wire fraud, interstate transportation of money taken by fraud (ITSP), concealment of funds belonging to a bankrupt estate, racketeering activities and RICO conspiracy. This indictment covered the activities of the clearinghouse operation for the period beginning at "an unknown date prior to September 1, 1980, to and including the date of [the superseding] indictment." The forty-nine count indictment dealt only with the activities of the interconnected clearinghouse operation. Subsequently, on November 16, 1983, a three-count indictment was filed solely against Mr. Cardall, charging him with three counts of interstate transportation of money taken by fraud in connection with the defunct FSI operation.[16]

Various delays forced the postponement of trial on the forty-nine count indictment. In the meantime, a jury trial on the three-count indictment proceeded in September 1984, resulting in Mr. Cardall's conviction on all three counts. Thereafter, a five-month jury trial was held from September 15, 1986, to February 17, 1987, on the forty-nine count indictment. Two defendants entered guilty pleas in mid-trial. The court dismissed some counts against the remaining defendants and sent the remainder to the jury. Mr. Cardall was convicted on 27 counts and acquitted on 3. Mr. Holman was convicted on 17 counts, Mr. Crowther on 18, Mr. Willmitt on 13, and Mr. Turner on 1. Mr. Anderson was convicted on 10 counts and acquitted on 1.

### E. *Issues on Appeal*

We address the following issues on appeal: (1) whether Mr. Cardall's second prosecution (on the forty-nine count indictment) violated the Double Jeopardy Clause; (2) whether appellants were entitled to a severance; (3) whether the district court's handling of the admissibility of co-conspirator statements against some of the defendants was proper; (4) whether evidence of the FSI scheme, allegedly at variance with the indictment, was appropriately admitted; (5) whether the evidence supported the convictions on those counts challenged by appellants; (6) whether the court correctly defined "taken by fraud" in its closing charge on the ITSP counts; (7) whether mailings required by law can serve as the basis for a mail fraud conviction; and (8) whether reversal of any predicate offense requires the reversal of the RICO substantive and RICO conspiracy convictions.

## II.

### A. *Double Jeopardy Claim*

Mr. Cardall argues that the second prosecution on the forty-nine count indictment was barred, on double jeopardy grounds,

---

**15.** A prior, 48–count indictment had been filed in May 1983.

**16.** A superseding indictment was filed in March 1984. Mr. Cardall's second indictment (dealing with the FSI operation) covered a period from March 22, 1979 through April 1980.

by his prior conviction pursuant to the three-count indictment.[17] In addition, he charges that the district court erred by applying the *Blockburger* test to determine the merits of his claim. *See Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

The trial court's double jeopardy determination is a conclusion of law which we review *de novo*. Under *Blockburger*, where the same act or transaction constitutes a violation of two distinct statutory provisions, "the test to be applied to determine whether [prosecution for both violates double jeopardy] is whether each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304, 52 S.Ct. at 182. The Supreme Court has made clear that the *Blockburger* test is the "principal test for determining whether two offenses are the same for purposes of barring successive prosecutions." *Illinois v. Vitale*, 447 U.S. 410, 416, 100 S.Ct. 2260, 2265, 65 L.Ed.2d 228 (1980) (citing *Brown v. Ohio*, 432 U.S. 161, 166, 97 S.Ct. 2221, 2226, 53 L.Ed.2d 187 (1977)).

■ The defendant bears the burden of proving a double jeopardy claim. *United States v. Jones*, 816 F.2d 1483, 1486 (10th Cir.1987). Mr. Cardall relies on footnote 6 of *Brown* to argue that its language acknowledges the existence of a second double jeopardy test in successive prosecution cases. The *Brown* footnote states in pertinent part:

> The *Blockburger* test is not the only standard for determining whether successive prosecutions impermissibly involve the same offense. Even if two offenses are sufficiently different to permit the imposition of consecutive sentences, successive prosecutions will be barred in some circumstances where the second prosecution requires the relitigation of factual issues already resolved by the first.

432 U.S. 166 n. 6, 97 S.Ct. at 2226 n. 6.

The footnote then discusses *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), and *In re Nielsen*, 131 U.S. 176, 9 S.Ct. 672, 33 L.Ed. 118 (1889), as cases in which collateral estoppel prevented successive prosecutions, protecting the defendant from relitigating factual issues which were necessarily resolved in an earlier trial. In our view, all the *Brown* footnote does is acknowledge the circumstance where, even if the offenses "pass" the *Blockburger* test, collateral estoppel may rise to constitutional Double Jeopardy dimensions and block further prosecution. We do not look beyond the *Blockburger* test in this case because, in his second prosecution, Mr. Cardall did not relitigate factual issues necessarily resolved in the first.

Appellant also argues that current double jeopardy analysis properly includes the *Blockburger* test and, *in addition*, a "necessary element" test. According to Mr. Cardall, this second test, first articulated in *In re Nielsen*, 131 U.S. 176, 9 S.Ct. 672, 33 L.Ed. 118 (1889), and developed in *Vitale*, forbids a second trial if the prosecution must rely on *conduct* already used to prove another offense. According to appellant, the *Vitale* test focuses on conduct and not just statutory elements.

The fundamental problem with Mr. Cardall's argument is that he equates the presentation of a similar block of evidence in his first and second trials with the *necessary* presentation of this evidence as the only way to establish the legal elements of the offenses charged. Admittedly, there was considerable FSI evidence presented in this case which had also been introduced in Mr. Cardall's first trial. However, it was appropriately used to show knowledge, pattern and plan under Fed.R.Evid. 404(b). It was *not required* to prove the elements of the crimes charged in the second prosecution.

As to Mr. Cardall's claim that the focus of the double jeopardy analysis is *conduct*, not the legal elements of the offense, we

---

**17.** At trial, Mr. Cardall moved to dismiss on double jeopardy grounds. The trial court denied the motion as frivolous in its Order filed August 28, 1986. Appellant then filed a Notice of Appeal on the double jeopardy question and a Motion to Stay. We denied the Motion to Stay on September 10, 1986.

believe the Supreme Court answered that contention in *Iannelli v. United States*, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293 n. 17, 43 L.Ed.2d 616 (1975), in which it stated: "[T]he Court's application of the [*Blockburger*] test focuses on the *statutory elements* of the offense. If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, *notwithstanding a substantial overlap in the proof offered to establish the crimes.*" (Emphasis added). *See also United States v. Davis*, 793 F.2d 246, 248 (10th Cir.), *cert. denied*, 479 U.S. 931, 107 S.Ct. 400, 93 L.Ed.2d 353 (1986) ("The double jeopardy test does not focus on the acts charged in the indictment or the evidence at trial, but rather on the elements of the crimes.").

▪ We agree with the trial court that the counts which were the subject of the first trial involved conduct which differed in time, place, and participants from that alleged in the second trial. In addition, the fact that FSI and the clearinghouse operation were arguably part of one continuing scheme and does not alter the result. Moreover, the dual conspiracy charge cases which appellant cites are not controlling because this is not a dual conspiracy charge case.

Nothing in our precedent precludes trial on individual substantive counts followed by a second prosecution for conspiracy. *Cf. United States v. Hines*, 713 F.2d 584 (10th Cir.1983) (prior conviction for conspiracy did not bar prosecution for related substantive offense). Based on our review of the record and the applicable law, we conclude that the trial court properly applied the *Blockburger* test in ruling that Mr. Cardall's prosecution on the forty-nine count indictment was not barred by the earlier prosecution.

▪ We also decline Mr. Cardall's invitation to exercise our supervisory powers[18] to vacate the second conviction on the basis of prosecutorial abuse. In effect Mr. Cardall argues that it was prosecutorial vindic-

tiveness to bring two indictments and two trials against him. We cannot agree that Mr. Cardall's second prosecution amounts to vindictiveness. Prosecutors have traditionally enjoyed discretion in deciding which of multiple possible charges against a defendant are to be prosecuted or whether they are all to be prosecuted at the same time. *United States v. Partyka*, 561 F.2d 118, 124 (8th Cir.1977), *cert. denied*, 434 U.S. 1037, 98 S.Ct. 773, 54 L.Ed.2d 785 (1978). In our view, the prosecutor in this case separated the indictments and prosecutions in a rational manner. Although, as a matter of policy, "a single trial ... may be a desirable prosecutorial aim, ... it is not a constitutional imperative." *United States v. Marshall*, 513 F.2d 274, 276 (5th Cir.1975), *cert. denied*, 423 U.S. 1048, 96 S.Ct. 773, 46 L.Ed.2d 636 (1976). We conclude that there is no evidence of prosecutorial abuse which would warrant the exercise of our supervisory powers.

### B. *Severance*

Appellants Holman, Willmitt, Crowther and Anderson each claim that they were entitled to severances, either of counts or of codefendants. Messrs. Holman and Willmitt argue that the Los Angeles operation ("L.A.") conducted by Mr. Willmitt was a separate rather than an adjunct enterprise of the Salt Lake City-based clearinghouse operation. As such, appellants argue, the two schemes were misjoined in one indictment, and required severance of the L.A.-related counts/parties prior to trial.

These appellants, however, understandably differ in their view of the problem caused by the alleged misjoinder. Mr. Holman asserts that "the trial of the defendants primarily charged with illegally obtaining the funds [should have been severed] from the trial of defendants charged with misusing or diverting ... funds" because "[t]he evidence proved [that the L.A. operation] fraudulently caused a diversion

---

**18.** "Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence." *McNabb*

*v. United States*, 318 U.S. 332, 340, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943). In exercising their supervisory powers, the courts may fashion appropriate remedies.

or transfer of funds ... even if the [clearinghouse] funds were legally obtained." Holman Brief, at 53, 54.[19] By contrast, Mr. Willmitt argues that he and another co-defendant were merely investment managers "with whom the Clearinghouse enterprise invested money in apparent attempts to earn profits for the Salt Lake operation." Willmitt Brief, at 49. Thus, he argues, he was prejudiced by evidence of the fraudulent means by which the clearinghouse principals obtained money from undertakers. *Id.*

Messrs. Crowther and Anderson[20] argue that they were entitled to a severance under Rule 14, Fed.R.Cr.P., because the government presented evidence of FSI activity in which they played no role. Mr. Crowther contends that the joint trial allowed the jury to hear evidence of co-conspirator misconduct which occurred after he had allegedly withdrawn from the conspiracy. Mr. Anderson also claims that severance was appropriate under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).[21]

Rule 8(a), Fed.R.Crim.P., provides that two or more offenses may be charged in the same indictment "if the offenses charged ... are of the same or similar character or are based on ... two or more acts or transactions connected together or constituting parts of a common scheme or plan." Fed.R.Crim.P. 8(a). Rule 8(b) provides that "[t]wo or more defendants may be charged in the same indictment ... if they are alleged to have participated in the ... same series of acts or transactions" constituting one or more offenses. Fed.R. Crim.P. 8(b). Rule 8(b) further provides that not all defendants must be charged in each count. *Id.* Finally, Rule 14 confers discretion on the trial court to grant a severance. Fed.R.Crim.P. 14.

 Questions of misjoinder under Rule 8(b) are questions of law, *United States v. Williams*, 809 F.2d 1072, 1085–86 (5th Cir.), *cert. denied*, 484 U.S. 896, 108 S.Ct. 228, 98 L.Ed.2d 187 (1987), and are subject to *de novo* review. *In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263, 1266 (10th Cir.1988). In our circuit, defendants charged jointly under Rule 8 "are not entitled to separate trials as a matter of right." *Bailey v. United States*, 410 F.2d 1209, 1213 (10th Cir.), *cert. denied*, 396 U.S. 933, 90 S.Ct. 276, 24 L.Ed.2d 232 (1969). Even if joinder is permissible under Rule 8, the trial court may nevertheless grant severance under Fed.R.Crim.P. 14 if joinder would prejudice one of the parties. Fed.R. Crim.P. 14.

 The decision whether to grant or deny severance is within the sound discretion of the trial court, and will not be disturbed on appeal unless there is an affirmative showing of an abuse of discretion. *United States v. Hack*, 782 F.2d 862, 870 (10th Cir.), *cert. denied*, 476 U.S. 1184, 106 S.Ct. 2921, 91 L.Ed.2d 549 (1986). To

---

19. In the alternative, Mr. Holman argues that even if the court concludes that joinder of defendants was proper, it was an abuse of discretion for the court not to separate the fraud counts, which dealt with the manner in which money was acquired, from the transporting counts, which dealt with conduct occurring after the funds had been obtained.

20. Mr. Anderson's contentions are presented in the trappings of constitutional Due Process and Confrontation Clauses arguments. Essentially, however, he argues that he was prejudiced by the introduction of the FSI evidence at trial. *See* Anderson Brief, at 25–27.

21. We find absolutely no support for Mr. Anderson's argument that this case is controlled by *Bruton*. In *Bruton*, the highly damaging out-of-court confession of a codefendant, who was not subject to cross-examination, was placed before a jury at a joint trial. The Su-

preme Court held that, under those circumstances, it would strain legal fiction to believe that the jury could disregard the inculpating statement in determining Mr. Bruton's guilt or innocence. Since the statement could not be tested by cross-examination, admission of the confession violated Mr. Bruton's rights under the Confrontation Clause of the Sixth Amendment.

The situation here is very different. The presentation of the FSI evidence did not involve inculpating confessions. Moreover, from the beginning it was made clear to the jury that none of the FSI evidence involved Mr. Anderson in any way. There is no basis for equating the introduction of the FSI evidence—against carefully identified defendants, and for proper limited purposes—with a violation of the Confrontation Clause.

establish an abuse of discretion, a defendant must show that actual prejudice resulted from the denial. *Id.* Moreover,

> [i]n deciding on a motion for severance, the district court has a duty to weigh the prejudice resulting from a joint trial of co-defendants against the expense and inconvenience of separate trials.... Neither a mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spillover effect' from the evidence that was overwhelming or more damaging against the co-defendant than that against the moving party is sufficient to warrant severance.

*Id.* (citations omitted).

 Applying these principles to the facts before us, we find none of defendants' arguments persuasive. With respect to the misjoinder argument, we believe that the indictment clearly alleged an ongoing series of *interconnected* illegal transactions amounting to the operation of a criminal enterprise. The fact that some defendants were not involved in each aspect of the overall enterprise did not require severing them or the charges against them. Furthermore, since the transportation counts required proof that the money was acquired by fraud, FSI evidence would have been admissible in any event at a separate trial limited to the transportation counts. Thus we conclude that there was no misjoinder under Fed.R.Crim.P. 8.

 Mr. Holman's claim under Fed.R. Crim.P. 14 likewise fails. We agree with the government's view that Mr. Holman's contention amounts, at most, to a claim that Mr. Willmitt's fraudulent acts "spilled over", impairing Mr. Holman's chances for acquittal. Under our precedent, severance is clearly not warranted on this basis.

 With respect to Messrs. Crowther and Anderson's claims for severance, we are of the opinion that the government's use of FSI evidence against Messrs. Cardall, Holman, and Turner did not prejudice Messrs. Crowther or Anderson. The court outlined its limiting instructions, *see* record, Trial Transcript, vol. 18, at 2126, 2169–70; vol. 19, at 2326, and expressly indicated in its closing instruction that the jury must consider individually the charges against each defendant and the evidence pertaining thereto, "leaving out of consideration entirely any evidence admitted solely against some other defendant or defendants." Record, Trial Transcript, vol. 73, at 14865–66. The assumption that juries can and will follow the instructions they are given is fundamental to our system of justice. *See Parker v. Randolph,* 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979) (plurality opinion). We believe that the trial court properly admonished the jury and, likewise, that the jury properly fulfilled its task.

 Mr. Crowther's second argument for severance at most raises a claim that his defense would be directly antagonistic to that of his co-defendants. In other words, Mr. Crowther claims he effectively withdrew from the conspiracy, and only severance would prevent prejudice to him based on the court's admission of conspiratorial statements made after his withdrawal.[22] Because the court's determination of the effectiveness of Mr. Crowther's withdrawal is a preliminary question of fact for purposes of admissibility under Fed.R.Evid. 104(a), *Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987), we review it under a clearly erroneous standard. On this record we cannot say that the court clearly erred in its determination that Mr. Crowther had not effectively withdrawn from the conspiracy. Moreover, we find no actual prejudice mandating severance on the basis of "irreconcilable" defenses.

---

**22.** A defendant bears the burden of establishing his withdrawal from the conspiracy. *See United States v. Parnell,* 581 F.2d 1374, 1384 (10th Cir. 1978), *cert. denied,* 439 U.S. 1076, 99 S.Ct. 852, 59 L.Ed.2d 44 (1979). Had Mr. Crowther effectively withdrawn, statements made thereafter by his co-conspirators would not have been admissible against him. *United States v. Mardian,* 546 F.2d 973, 978 n. 5 (D.C.Cir.1976); *see also Lutwak v. United States,* 344 U.S. 604, 617–18, 73 S.Ct. 481, 489–90, 97 L.Ed. 593 (1953).

## C. *Preferred Order of Proof*

▮ Appellants Anderson and Willmitt challenge the trial court's decision to permit deviation from the preferred order of proof supporting the admissibility of coconspirators' statements.

Prior to trial, the government petitioned the court for permission to deviate from the preferred order of proof. After a hearing on the matter, the court granted the government's request. Mr. Anderson argues that by granting the government's request, the court "denied itself the opportunity to recognize that the evidence offered to establish [Mr.] Anderson's complicity in the conspiracy was insufficient." Anderson Brief at 17. Mr. Willmitt's objection is somewhat different, although no less general. Mr. Willmitt acknowledges that he did not initially oppose the government's request. However, he now asserts that the government's pretrial proffer mislead counsel and resulted in counsel misdirecting "[his] energy toward rebutting the evidentiary statements contained in the proffer ... at the expense ... of other aspects of the case." Willmitt Brief at 71.

This court adopted a preferred order of proof in *United States v. Petersen*, 611 F.2d 1313, 1330–31 (10th Cir.1979), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980); *see also United States v. Austin*, 786 F.2d 986, 990 (10th Cir.1986) (reaffirming preferred order of proof). In *Petersen*, we recognized "that in certain instances where it is not 'reasonably practicable to require the showing to be made before admitting the evidence, the court may admit the statements subject to being connected up.'" *Petersen*, 611 F.2d at 1330 (quoting *United States v. James*, 590 F.2d 575, 582 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979)). Since that time—this court has deferred on several occasions to the trial court's discretionary judgment to permit deviation from the preferred procedure. *See, e.g., United States v. Hernandez*, 829 F.2d 988, 993–94 (10th Cir.1987), *cert. denied*, ⸺ U.S. ⸺, 108 S.Ct. 1486, 99 L.Ed.2d 714 (1988); *United States v. Troutman*, 814 F.2d 1428, 1448 (10th Cir. 1987); *United States v. Rivera*, 778 F.2d 591, 595–96 (10th Cir.1985), *cert. denied*, 475 U.S. 1068, 106 S.Ct. 1384, 89 L.Ed.2d 609 (1986); *United States v. Harenberg*, 732 F.2d 1507, 1512–13 (10th Cir.1984).

Here, the trial court correctly applied this exception when it made an initial determination at the pretrial hearing that the government's proffer presented substantial evidence that a conspiracy existed and that defendants were members thereof. Thereafter, at the close of the case, the court again made specific findings under a preponderance standard that the evidence was sufficient to establish *each* defendant's participation in the conspiracy.[23] Mr. Willmitt's second argument that the court improperly considered hearsay declarations made by Mr. Cardall to find that Mr. Willmitt was a member of the conspiracy is meritless in light of *Bourjaily*.[24]

## D. *Admission of FSI Evidence* [25]

Appellants Willmitt, Anderson and Holman appeal the trial court's decision to permit the introduction of extensive evi-

---

**23.** The standard of proof on preliminary facts is preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

**24.** In *Bourjaily*, the defendant claimed that the trial court had improperly considered hearsay statements by his coconspirators in determining that a drug conspiracy existed and that the statements were in furtherance of the conspiracy. The trial court had admitted the statements against the defendant under Fed.R.Evid. 801(d)(2)(E), the rule which provides that coconspirator's statements are not hearsay. See text *infra*, n. 29. Relying on Fed.R.Evid. 104(a), the Supreme Court affirmed the conviction,

holding that "a court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted." 107 S.Ct. at 2782.

**25.** The FSI evidence was received under Fed.R. Evid. 404(b), which provides:

(b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes such as proof of *motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.*

dence concerning the predecessor FSI operation. Messrs. Willmitt and Anderson claim that the FSI evidence constituted a material variance from the indictment under which they were tried, thus requiring the reversal of their convictions. Specifically, Mr. Anderson claims that admission of the evidence as to the "separate" FSI conspiracy resulted in "surprise and inadequate opportunity to prepare a defense." Anderson Brief, at 35. Mr. Willmitt argues that (1) the indictment gave insufficient notice that FSI would be an issue in the case; (2) introduction of "irrelevant" FSI evidence improperly broadened the indictment; and (3) because of the joint trial, a transference of guilt resulted from the presentation of evidence incriminating his co-defendants (Messrs. Cardall, Holman, and Turner).

Mr. Holman also joins the variance argument. In addition, he claims that (1) the FSI evidence dealt with Mr. Cardall's prior bad acts, and that the court's decision to receive that evidence in a joint trial unduly prejudiced him, and (2) the court erred in not requiring the prosecution to show that Mr. Holman was a co-conspirator in the "separate" FSI conspiracy before receiving that evidence against him.

■■■■■ The variance issue is a question of law which we review *de novo*. *See* 2 S. Childress & M. Davis, Standards of Review § 11.32, at 144 (1986). A variance occurs "when the evidence presented at trial establishes facts different from those alleged in the indictment." *United States v. Pinto*, 838 F.2d 426, 433 (10th Cir.1988). In evaluating a variance claim, the key inquiry for the court is whether the variance of proof affected the substantial rights of the accused. *Id.* Courts have found preju-

dicial variances in cases in which the indictment fails to give the defendant adequate notice of the evidence to be presented against him, *see United States v. Rinke*, 778 F.2d 581, 590 (10th Cir.1985); where conviction based upon the indictment will not bar subsequent prosecution, *id.;* and where there is a strong likelihood of "transferred" guilt as a result of the presentation of incriminating evidence relating to conduct of a co-defendant in which the accused did not participate. *See Kotteakos v. United States*, 328 U.S. 750, 766–67, 66 S.Ct. 1239, 1248–49, 90 L.Ed. 1557 (1946).

■■■■ We reject appellants Anderson and Willmitt's contention that the FSI evidence constituted a prejudicial variance requiring reversal of their convictions. We believe the language of the indictment should have put defendants on notice that FSI evidence would likely be introduced preliminarily to, and in conjunction with, the proof necessary to show that the clearinghouse operation perpetrated fraud on investors.[26] Moreover, the admissibility of FSI evidence was the subject of extensive pretrial motions and hearings, giving counsel notice that it would arise at trial and the opportunity to anticipate and prepare a defense.

More significantly, however, it is abundantly clear from the record that FSI evidence was only received against appellants Cardall, Holman, and Turner. The government so conceded and the court repeatedly cautioned the jury of that fact. Finally, the court, in its closing instructions to the jury, carefully noted that some evidence had been admitted for limited purposes and against certain specific defendants, and could only be considered as to those individuals. We assume the jury heeded the trial court's cautionary instructions and proper-

---

26. Paragraphs 16–18 of the indictment state:

16. It was a part of the scheme and artifice to defraud that RICHARD TAYLOR CARDALL, in conjunction with other defendants herein, including JOSEPH A. HOLMAN and GERALD L. TURNER, began marketing, through a company known as Fiscal Services, Inc. [FSI], doing business at 355 South Ninth East, Salt Lake City, Utah, a program known as a "factoring accounts payable" program.

17. It was a further part of the scheme and artifice to defraud that this "factoring ac-

counts payable" program, as operated through Fiscal Services, Inc., was operated fraudulently and failed.

18. It was further a part of the scheme and artifice to defraud that the defendants herein under the direction of RICHARD TAYLOR CARDALL organized and executed the clearinghouse operation. The clearinghouse operation ran what was represented to be a "factoring accounts payable" program.

Addendum to Appellant Cardall's Brief, at 5.

ly fulfilled its task. *See Parker*, 442 U.S. at 73, 99 S.Ct. at 2139. Therefore, the admission of FSI evidence against defendants did not constitute a prejudicial variance.

As to appellant Willmitt's contention that he was prejudiced by "transferred guilt" as a result of evidence which incriminated Messrs. Cardall, Holman, and Turner, we have carefully reviewed the record and find no support for this claim. We believe that the court's repetition of the limiting instructions adequately protected Mr. Willmitt's interests.

We believe, however, that there is merit to Mr. Holman's claim of error. The recent Supreme Court decision in *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), guides us in this area. The *Huddleston* Court held that trial courts need not make a preliminary finding under Rule 104(a) that the government has proved the "other act" by a preponderance of evidence before it admits "similar acts" evidence under Rule 404(b). *Id.*, 108 S.Ct. at 1501. According to the Court, "such evidence should be admitted if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act." *Id.* at 1499. The Court then identified four safeguards which protect the defendant from unduly prejudicial evidence which might be introduced under Rule 404(b): (1) the evidence must be offered for a proper purpose, (2) the evidence must be relevant under 402 as enforced through Rule 104(b); (3) the trial court must determine whether the probative value of the similar acts evidence is not substantially outweighed by its potential for unfair prejudice under Rule 403; and (4) the trial court must, upon request under Rule 105, instruct the jury that the similar acts evidence must be considered only for the limited purpose for which it was admitted. *Id.* at 1502.

██ Our circuit has outlined stringent requirements to ensure that the evidence is offered for a "proper purpose." Specifically, the government must show how the proffered evidence is relevant to an issue in the case by "articulat[ing] precisely the evidentiary hypothesis by which a fact of consequence may be inferred from the evidence of other acts." *United States v. Kendall*, 766 F.2d 1426, 1436 (10th Cir. 1985), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986). Moreover, the trial court must "specifically identify the purpose for which such evidence is offered and a broad statement merely invoking or restating Rule 404(b) will not suffice." *Id.*

We are not fully convinced that the government "articulated precisely" the basis on which the FSI evidence was being offered against Mr. Holman. However, because we consider the issue of relevance dispositive, we need not address how precisely the prosecution and the court must articulate the bases on which the evidence is admitted.

██ According to the *Huddleston* Court, "[i]n the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred *and that the defendant was the actor.*" *Id.*, 108 S.Ct. at 1501 (emphasis added). We understand this to mean that before similar "bad acts" may be admitted against an individual, there must be reasonable indication in the record that the defendant was in fact a party to the bad acts sought to be brought in against him. We do not believe that the relevance requirement under Rules 404(b), 402 and 104(b) can be met with respect to one defendant by introducing evidence of the bad acts of the defendant's *other* associates.

In this case there was ample evidence to support a finding that Messrs. Cardall, Turner, and a non-defendant, Mr. Davidson,[27] were involved in improper, if not outright, criminal activities in conjunction with FSI. However, our painstaking review of all the FSI evidence cannot support

---

27. Mr. Davidson was a key government witness during the FSI portion of the trial. He initially joined FSI as a salesman but became "president" of FSI in August of 1979. He was indicted on FSI-related fraud charges and entered into a plea bargain wherein he pled guilty to two counts of mail fraud and agreed to testify against the other FSI principals. In exchange, the government agreed to drop the remaining charges against Mr. Davidson.

a similar finding with regard to Mr. Holman.[28] In our view, the offered evidence could not have survived a careful Rule 104(b) conditional relevance determination—that Mr. Holman was actually involved in the bad acts which the government sought to use against him. We conclude that the court erred in admitting the FSI evidence against Mr. Holman under Fed.R.Evid. 404(b) because the government failed adequately to connect Mr. Holman to the fraudulent actions of other FSI principals.

We find no merit to the government's alternative contention that FSI evidence was nevertheless admissible under the coconspirator exception of Fed.R.Evid. 801(d)(2)(E).[29] We have checked every reference by the court concerning the admissibility of FSI evidence and have found that the court always grounded its admissibility rulings in Rule 404(b).[30]

We conclude that Mr. Holman was significantly prejudiced by the improper admission of FSI evidence against him. Consequently, we reverse his conviction on this ground and remand for a new trial on the charges in the indictment without the prejudicial impact of the FSI evidence.

### E. The "Taken by Fraud" Instruction and the Proof Necessary to Establish the ITSP Counts

Appellants Crowther and Cardall[31] challenge their convictions for the interstate transportation of money taken by fraud on two grounds: (1) that the trial court erred in instructing the jury on the meaning of "taken by fraud"; and (2) that the government failed to prove that each dollar transported across state lines came from identifiable undertakers who had been defrauded.

Appellants argue that the jury instruction failed to inform the jury that the investors must have reasonably relied on the misrepresentations in order to establish that the funds were "taken by fraud."[32]

---

**28.** Mr. William L. Allen gave the only testimony which would support an inference that Mr. Holman may have had knowledge of the improprieties in the FSI operation. Mr. Allen served as secretary to FSI when it was first organized. He testified that in early spring, 1979, he traveled with Mr. Holman on two occasions in conjunction with FSI business. During the second trip, and directly as a result of the information he had gleaned from the two trips, Mr. Allen submitted his resignation to Mr. Holman. Nothing in the record indicates with greater specificity the basis for Mr. Allen's resignation.

To the extent that this evidence was probative of Mr. Holman's knowledge of bad acts by FSI principals, we believe Mr. Allen's testimony was properly admitted, but not under Rule 404(b). We view Mr. Allen's testimony simply as competent evidence, properly admitted under Rules 401, 402, and 403 of Mr. Holman's possible knowledge of improper FSI activity. Clearly, this evidence falls far short of linking Mr. Holman to any bad acts by other FSI principals.

**29.** Fed.R.Evid. 801(d)(2)(E) provides that "[a] statement is not hearsay if ... [it] is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." The government asserts that "[t]he court found that Holman was part of the FSI activities and admitted the statements and other evidence made by coventurers against him." Appellee's brief at 54. This statement is made without *any* citation to the record indicating such a "finding" by the court. *See* Tenth Circuit Rules 28.1 and 28.2.

Without the citations to the record, our review cannot support this assertion.

**30.** In addition, even if we accepted the government's contention that FSI evidence was admissible under Rule 801(d)(2)(E), we believe that its admissibility under that rule would have constituted an improper variance in the indictment against Mr. Holman.

**31.** Appellant Holman raises a similar argument challenging his ITSP convictions. However, because we disposed of Mr. Holman's appeal above, we need not address his ITSP claim in this discussion. *See supra* at 670–72.

**32.** The court's instructions on this charge state in pertinent part:

Instruction number 41. Interstate transportation of money taken by fraud.

The indictment charges certain defendants with violating 2314, of Title 18 of the United States code. Those are the defendants in the counts I've read. That section, in pertinent part, provides:

Whoever transports in interstate or foreign commerce, any goods, wares, merchandise, securities or money of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud, shall commit a crime.

42. ... Definition of transportation of money taken by fraud.

The phrase transports in interstate commerce, means transporting money from one state to another.

The government responds that the court's language adequately conveyed the notion that the owner surrendered the money because of misrepresentation or deceit.

 When examining a challenge to jury instructions, "we review the record as a whole to determine whether the instructions 'state the law which governs and provided the jury with an ample understanding of the issues and the standards applicable.'" *Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1271 (10th Cir.1988) (quoting *Ramsey v. Culpepper*, 738 F.2d 1092, 1098 (10th Cir.1984)). Thus, we "consider all that the jury heard and, from standpoint of the jury, decide 'not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine these issues.'" *Durflinger v. Artiles*, 727 F.2d 888, 895 (10th Cir.1984) (quoting *Alloy Int'l Co. v. Hoover–NSK Bearing Co.*, 635 F.2d 1222, 1226–27 (7th Cir.1980)). We reverse only if, in light of the preceding considerations, the error is prejudicial. *Big Horn Coal*, 852 F.2d at 1271 n. 19.

██ The indictment charged these defendants with participation in a scheme to defraud, and in particular, with interstate transportation of money secured through fraud in connection with the scheme. The court's instructions emphasized that fraud resulted when money was "taken from its owner through misrepresentations or deceit." To reach its conclusion that defendants were guilty on these counts, the jury must have first concluded that: (1) misrepresentations were made, at least to some portion of the investors, and (2) that as a result of those misrepresentations, investors were induced to part with their money.

Our review of the record convinces us that the court did not commit reversible error in its instruction. We agree with the government that the instruction of fraud *implicitly* included the element of reliance. While a more specific instruction might have been preferable, on the whole the trial court's instruction appropriately stated the law.

Appellants also raise what amounts to a sufficiency of the evidence challenge to the ITSP counts. When the sufficiency of the evidence supporting a criminal conviction is challenged, we must view all the evidence, both direct and circumstantial, in the light most favorable to the government. *United States v. Culpepper*, 834 F.2d 879, 881 (10th Cir.1987). In conducting our review, we "[do] not consider the credibility of witnesses or weigh conflicting evidence." *United States v. Hines*, 696 F.2d 722, 730 (10th Cir.1982) (citation omitted). The evidence is considered sufficient if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

As to the $5,000 or more that must be involved, the essence of the crime is the movement in interstate commerce of money taken by fraud. That the money changed form to a check or other similar type of instrument for convenience in transferring it, is insignificant. What is significant is that when the transaction is completed, $5,000 or more of money taken by fraud, exists or may be obtained at the final destination.

The phrase, taken by fraud, refers to money taken from its owner through misrepresentations or deceit, with the intent to deprive the owner of the use of the benefits of ownership.

43. ... Elements of transportation of money taken by fraud. In order to meet its burden, the government must establish beyond a reasonable doubt each one of the following four elements of the crime of transportation of money taken by fraud in each of the counts charged against the defendants involved therein:

1. That the money charged in the account was taken by fraud. Found a little extra word there.

2. That the defendant transported the money in interstate commerce, interstate or foreign Commerce, or caused it to be transported.

3. That at the time of the transportation, defendant knew the money had been taken by fraud.

4. That the amount of money taken by fraud and transported in interstate commerce was $5,000 or more.

Each and all of the foregoing elements must be established by the government by evidence that convinces beyond a reasonable doubt. Record, vol. 73, Trial Transcript, at 14893–95.

The essential elements [33] of ITSP are: (1) transporting, or causing the transportation, (2) in interstate commerce,[34] (3) of property valued at $5,000 or more,[35] (4) with knowledge that it has been stolen, converted, or fraudulently taken from its rightful owner. 18 U.S.C. § 2314 (1982). Appellants claim that the government did not prove its case because it failed to trace the money which crossed state lines through the commingled funds in the operation's multiple bank accounts to individually defrauded investors.[36]

■ Although appellants' argument is not clearly developed, to the extent that it rests on the contention that the transported funds must be *precisely* the ones taken from the defrauded investors, that is clearly *not* the law. *See, e.g., United States v. Morgan,* 805 F.2d 1372, 1377–78 (9th Cir. 1986) ("[I]t is not necessary for the government to show that the precise object stolen, converted, or taken by fraud be transported. It is sufficient if the item transported is directly derived from the property stolen, converted, or taken by fraud."), *cert. denied,* 480 U.S. 949, 107 S.Ct. 1612, 94 L.Ed.2d 797 (1987). *See also United States v. Levy,* 579 F.2d 1332, 1337 (5th Cir.1978) (although a literal reading of § 2314 would require that the very object taken by fraud be transported in interstate commerce, such a narrow reading would clearly frustrate Congress' purposes in enacting the statute), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1243, 59 L.Ed.2d 471 (1979); *United States v. Pomponio,* 558 F.2d 1172, 1175 (4th Cir.1977) ("The plain language of the Act does not impose any requirement that the security transported in interstate commerce be taken directly from the person who was defrauded. The imposition of such a requirement by judicial gloss would defeat the purpose of the Act."); *United States v. Walker,* 176 F.2d 564, 566 (2d Cir.) (holding that when funds are "taken feloniously by fraud" and transported across state lines, they fall within the purview of the statute regardless of the form to which they are converted), *cert. denied,* 338 U.S. 891, 70 S.Ct. 239, 94 L.Ed. 547 (1949).

In addition, appellants rely on *United States v. Poole,* 557 F.2d 531 (5th Cir.1977), to support their contention that the conviction must fall because funds involved in the interstate transfers must be presumed "innocent" funds. In our judgment, *Poole* is inapposite. In *Poole,* the defendant "sold" a nonexistent "heavy duty earth excavator" to a Louisiana corporation. Defendant deposited the purchaser's check, drawn on a Baton Rouge, Louisiana, bank, in his own account at a Lafayette, Louisiana, bank. He then wrote a check on his Lafayette account for the same amount as the purchase price and deposited it in his account in a Beaumont, Texas, bank. The *Poole* court reversed defendant's conviction under section 2314, holding that the transfer of money from the Louisiana bank to the Texas bank was not a transfer of exact monies taken by fraud from the purchaser. The court reasoned that the purchaser's check had been deposited into an already-existing account and commingled with other "innocent" funds; and when the check was presented to the Louisiana bank for payment, there were surplus funds in the account to pay the checks without drawing on the fraudulently acquired funds. Consequently, there was no proof that the

---

**33.** As we noted in *United States v. Wright,* 791 F.2d 133, 135 (10th Cir.1986), "§ 2314 contains five subsections, each of which constitutes a separate offense." The elements outlined above pertain to the second paragraph which forms the basis of the present indictment and trial.

**34.** Appellants did not challenge the fact that these transfers were interstate transfers.

**35.** The amount of each transfer unquestionably exceeded $5,000.

**36.** Appellants cite *Dowling v. United States,* 473 U.S. 207, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985), as one authority in support of this contention. Their reliance on *Dowling* is misplaced. In that case the Supreme Court addressed a totally different issue—the applicability of section 2314 to the shipment of bootlegged sound recordings and motion pictures whose unauthorized distribution infringed valid copyrights. The Court reversed the conviction holding that "Congress had no intention to reach copyright infringement when it enacted § 2314." *Dowling,* 473 U.S. at 226, 105 S.Ct. at 3137.

fraud-tainted funds had traveled in interstate commerce.

Unlike the situation in *Poole*, there is no basis to presume that the funds existing in the clearinghouse accounts at the time of the interstate transfers were "innocent" funds. Here, circumstantial evidence overwhelmingly supports a finding that the significant majority of undertaker funds were obtained by fraud, undermining the presumption which, although unstated, forms the basis of *Poole*'s holding.

■■■■ The following evidence convinces us. The government traced ninety-seven percent of the funds in the defendants' numerous accounts [37] to undertaker investments. The interstate transfers were made from these accounts. In order to prove that the funds were obtained by fraud, the government showed that the clearinghouse operation recruited investors through sales presentations in which sales personnel mastered and gave boilerplate presentations to prospective investors. The presentations misrepresented the existence of a viable payables program and the purposes for which investor funds would be used.[38] In our view, the proof of fraud was so overwhelming that the jurors could have easily inferred from the strong circumstantial evidence before them that for each ITSP count, defendants knowingly caused at least $5,000 in fraudulently obtained funds to cross state lines.

### F. Challenges to Sufficiency of the Evidence

Appellants raise various challenges to the sufficiency of the evidence. *See* standard of review, *supra* at 673–74.

#### 1. Appellant Turner

■■■■ Mr. Turner challenges his conviction of bankruptcy concealment claiming that evidence supporting his conviction is insufficient, and that his conviction, in light of the acquittal of another defendant *on a separate count* (but arising out of the same facts), constitutes an inconsistent verdict which cannot be sustained.[39]

Here, the evidence indicated that on September 24, 1981, (eight days *after* bankruptcy was filed by Mr. Turner on behalf of the clearinghouses, *and the day before a bankruptcy trustee was to be named*), Mr. Turner deposited two checks drawn on clearinghouse funds into his office account at Valley Bank & Trust. The next morning, before appearing at bankruptcy court, Mr. Turner called Valley Bank and requested that the checks he had deposited the previous afternoon be taken to Empire State Bank [40] and negotiated for cashier's checks. Those checks were to be redeposited into Mr. Turner's account. That same morning a Valley Bank employee carried out Mr. Turner's instructions.

At approximately 10:00 a.m. that day, Mr. Turner appeared before the Bankruptcy Court and represented to the court that he had no control over clearinghouse assets. At that hearing the bankruptcy court ordered that the clearinghouse accounts be frozen. By the time the court clerk contacted Empire State, however, the transactions at issue had already been completed. We believe the evidence was more than sufficient for any reasonable trier of fact to find the essential elements of bankruptcy concealment beyond a reasonable doubt.

---

**37.** Government evidence demonstrated that undertaker money was deposited in 23 bank accounts, and that the money found its way through transfers into 11 additional bank accounts.

**38.** In reality, undertaker monies acquired through sales presentations were used for purposes other than those represented by sales personnel, they were used to pay obligations due on old investments, and bankruptcy was used as a ploy to hinder and delay the discovery of the fraud.

**39.** Shortly after the Clearinghouses filed for bankruptcy, Mr. Turner procured payment (to

himself and others) from clearinghouse accounts. He received two checks, one for $54,000 from Universal Clearinghouse (signed by defendant Anderson), and one for $16,000 from International Clearinghouse (signed by defendant Ashby). These checks form the basis of Counts 35 and 36 of the indictment. Initially Mr. Turner was named in both counts, but later Count 36 (dealing with the $16,000 check) was dismissed by the government as to Mr. Turner.

**40.** Both the UCH and ICH accounts were located at Empire State Bank.

■ Mr. Turner also claims that Mr. Ashby's acquittal under Count 36 of the indictment, and Mr. Turner's own conviction under Count 35 cannot be reconciled because both arose out of the same set of facts. A properly convicted defendant cannot win reversal because the jury acquitted another defendant. *United States v. Cudd*, 499 F.2d 1239, 1242 (10th Cir.1974) ("A joint indictment ... is but a procedural convenience and is to be considered as a separate charge against each defendant."). The fact that the same jury found Mr. Ashby not guilty of bankruptcy concealment on Count 36 in no way calls into question Mr. Turner's proper conviction under Count 35.

### 2. Mr. Crowther

■ Appellant Crowther claims that there was insufficient evidence to convict him of Count 16—an ITSP count. The trial evidence established that Mr. Crowther was a clearinghouse principal involved in its daily operations. He occasionally recruited sales staff and on at least one occasion falsely represented that a certain company was affiliated with the payables program.

One of Mr. Crowther's responsibilities involved identifying possible investment opportunities for the clearinghouses. Count 16 arose out of one of those transactions. Appellant Crowther was one of the signatories in a Denver, Colorado bank account in which fifty thousand dollars were deposited in January 1981. Those funds were secured through fraud from a Utah investor. One day after the money was deposited, Mr. Crowther withdrew all the funds in the form of two cashier's checks and closed the Colorado bank account. The account proceeds were thereafter placed in a high-risk investment in precious metals.

Although Mr. Crowther contends that there was no evidence directly linking him to the transportation of the funds "either through fingerprint identification or handwriting identification," Crowther Brief at 27, we believe this contention views the evidence needed for conviction too narrowly. We are of the opinion that the evidence presented was sufficient for a jury to conclude that (1) Mr. Crowther had knowledge that the $50,000 at issue was obtained by fraud and (2) Mr. Crowther caused the funds to be transported in interstate commerce. His conviction on Count 16 is affirmed.

### 3. Mr. Willmitt

■ Appellant Willmitt challenges the sufficiency of the evidence supporting his convictions on ITSP, mail fraud, and wire fraud counts. Mr. Willmitt does not challenge the fact that the transfer of funds which form the basis of the various counts in fact took place. Rather, he re-argues the question of his role as a principal in the clearinghouse operations. The gist of Mr. Willmitt's argument is that because he had no role in directly establishing or implementing the undertaker side of the operation, the government failed to prove that he knew anything about the misrepresentations which were at the heart of the fraudulent scheme. As part of his argument, Mr. Willmitt takes issue with trial testimony which identified him as a principal in the clearinghouse organization.

The evidence presented at trial indicated that (1) Mr. Willmitt was aware of and discussed the general business operations with Mr. Cardall; (2) his level of control over assets and individuals in the operation led at least two individuals to conclude that Mr. Willmitt was a principal in the operations; (3) Mr. Willmitt's offices in the Los Angeles area were connected by computer (including electronic mail) with the Cardall offices in Salt Lake City; (4) identical copies of business documents were found in Mr. Willmitt's office and in Mr. Cardall's possession; (5) in taped telephone conversations Mr. Willmitt offered to backdate contracts in order to justify the receipt of payments to Mr. Willmitt's investment company; (6) one of the Cardall-controlled businesses—Payable Accounting Company—paid for services rendered in Los Angeles by an accountant hired by Mr. Willmitt to perform some work for him; (7) seven clearinghouse bank accounts served as the source of funds for ninety-four percent of

the Willmitt-controlled bank accounts in California; (8) Mr. Willmitt was a party to the fraudulent preparation of contracts and letters to support the claim that a buyer had been found for the Bahia Kino property; (9) checks issued from Willmitt-controlled accounts (containing clearinghouse funds) went to pay for a car for Mr. Cardall's son, as well as for personal expenses incurred by Mr. Willmitt and his daughter; and (10) when word of the FBI search of Cardall's Salt Lake City offices reached Mr. Willmitt, he contacted his daughter in California and directed her to remove all Salt Lake City-related documents from the Willmitt offices in California. This brief summary of the extensive record amply supports the jury's conclusion that Mr. Willmitt knew that the moneys at issue were taken by fraud. Appellant's conviction on the ITSP, mail fraud, and wire fraud counts are affirmed.

■ Mr. Willmitt next argues that the evidence did not support his conviction on the bankruptcy fraud charge and that the jury instruction on that issue was contrary to law. Mr. Willmitt relies heavily on the fact that the $35,000 he received two days after ICH and UCH filed their bankruptcy petitions was drawn on a Payable Accounting Company's (PAC) account, rather than on one of the numerous clearinghouse accounts.[41] According to appellant, since PAC had not filed for bankruptcy, it was not a "debtor" within the meaning of the Bankruptcy Code, and, therefore, he had not engaged in concealment. Mr. Willmitt argues that at the time he received it, the money was the "legal and equitable" property of PAC and that he "was legally entitled to assume that [the] cashier's check was the property of PAC, not IHC or UCH...." *Id.* at 77. At most, he argues, the money was subject to recovery as an avoidable preference or fraudulent transfer only after the bankruptcy trustee "obtained a judicial declaration that its trans-

fer [from the clearinghouses] to PAC was void." Willmitt Brief, at 79.

Mr. Willmitt's argument overlooks two critical facts: (1) the evidence indicated, and the jury believed, that Mr. Willmitt was a principal in the clearinghouse operation, and (2) the plain language of section 541 of the bankruptcy code clearly and broadly defines what constitutes the debtor's property.

As a principal in the interrelated operations which comprised the scheme, Mr. Willmitt cannot now claim that he innocently relied on PAC's legal "ownership" of the funds he received. Testimony indicated that Mr. Willmitt was privy to Mr. Cardall's confidences concerning the business operation, and that his suggestions influenced the course of the business. Additionally, the evidence showed that numerous bank accounts were established by Cardall-controlled businesses and Willmitt-controlled businesses, and that extensive intercompany transfers were part and parcel of the overall scheme's operational mode. Finally, the evidence established that Mr. Willmitt had discussed bankruptcy plans with Mr. Cardall at the very time they were fraudulently "contracting" to sell the Bahia Kino property. From all of this evidence, any reasonable trier of fact could find beyond a reasonable doubt that Mr. Willmitt knew that the funds ostensibly drawn from the PAC account in fact constituted funds belonging to the debtor clearinghouses' estate.

■ Secondly, the clear and unambiguous language of section 541 states:

(a) The commencement of a case under Section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, *wherever located and by whomever held:*

(1) Except as provided in subsections (b) and (c)(2) of this section,[42] all legal or equitable interests of the debtor in property as of the commencement of the case.

---

**41.** The record indicates that on September 18, 1981, Messrs. Cardall and Anderson issued a $35,000 check on the PAC account with which they purchased a cashier's check payable to Mr. Willmitt's Baltimore Investment Company. Mr.

Willmitt endorsed the cashier's check and cashed it.

**42.** Neither subsection's exclusion is pertinent herein.

11 U.S.C. § 541 (1982 & Supp. II 1984) (emphasis added). This section "is to be broadly construed to include all property interests, whether reachable by state-law creditors or not, and whether vested or contingent. This definition draws into the estate all of the Debtor's property interests as of the filing date, save [the restricted transfer of beneficial interest in a trust.]" *In re DeWeese*, 47 B.R. 251, 254 (W.D.N.C. Bankr.1985) (citation omitted); *see also In re Shore Air Conditioning & Refrigeration*, 18 B.R. 643, 646 (D.N.J.Bankr. 1982) (Clear wording and intent of drafters demonstrates that scope of § 541(a) is very broad and encompasses *all* interests of debtor as of date its petition is filed.). A plain reading of this broadly worded section makes clear that clearinghouse funds diverted into interrelated company accounts did not lose their status as "debtor's property" simply because they were held in a PAC account.

▮ Finally, Mr. Willmitt claims that the jury instruction on this count was contrary to law because it failed to include the

terms "legal or equitable" as modifiers of the word "interest".[43] As we've noted previously, in examining a challenge to a jury instruction, "we review the record as a whole to determine whether the instructions 'state the law which governs and provided the jury with an ample understanding of the issues and the standards applicable.'" *Big Horn Coal*, 852 F.2d at 1271. Here, the court's instruction clearly conveyed the essence of the law and provided the jury with an understanding of the applicable standard. The court's omission of the words "legal" or "equitable" in restating the section in no way prejudiced appellant.

Finally, Mr. Willmitt challenges his conviction under RICO. In light of our preceding discussion concerning his involvement as a principal in the clearinghouse operation, we find no merit to his contentions. Mr. Willmitt's convictions on all grounds are affirmed.

### 4. Mr. Anderson

▮ Appellant Anderson claims that he was merely a "gofer" in the clearinghouse

---

**43.** The court's instruction as to Count 38 (charging Mr. Willmitt with fraudulent receipt of property belonging to a bankrupt's estate) read as follows:

69. Count 38 of the indictment charges Stanley Willmitt with Fraudulent Receipt of Money in violation of Section 152 of Title 18 of the United States Code. Paragraph 5 of that Section in pertinent part provides:

Whoever knowingly and fraudulently receives any material amount of property of a debtor after the filing of a case under Title 11, with intent to defeat the provisions of Title 11, shall commit a crime.

As used in the foregoing code section, the term debtor refers to the entity filing for protection under the Bankruptcy Laws.

70. Bankruptcy Fraud. Elements of Fraudulent Receipt of Money. In order to convict the Defendant Willmitt under Count 38 of the Indictment, the government must prove the following elements by evidence that convinces the jury beyond a reasonable doubt.

1. That on or about September 16, 1981, the debtor filed a case under Title 11 of the Bankruptcy Act.

2. That on or about September 18, 1981 and after the filing of the Title 11 case, the Defendant Willmitt received a material amount of property, $35,000, from the debtor.

3. That the Defendant Willmitt received said property knowingly and fraudulent with

the intent to defeat the provisions of Title 11 of the Bankruptcy Act.

For purposes of this case the provisions of Title 11 of the Bankruptcy Law are defeated when a person without Court approval acts in a manner that diminishes the estate of the debtor, and thus interferes with the equitable use of distribution of any material part of the assets of the estate.

77. Bankruptcy Fraud. Under the Bankruptcy Act, the estate of the debtor includes all property in which the debtor had an interest on the date of the commencement of the bankruptcy, wherever such property is located. The estate includes both tangible and intangible property as well as bank accounts and cash. Even when a debtor is acting as a debtor in possession, until the appointment of a trustee, the property in possession of the debtor is still the property of the estate. The fact that property may have been maintained in bank accounts not in the name of the debtors on the bankruptcy petitions, those being Independent Clearinghouse and Universal Clearinghouse, does not necessarily mean that the property is not that of the debtor. Property of the debtor means all non-exempt property, regardless of in which name said property is kept or maintained.

Opening Brief of Appellant Stanley Willmitt, at 75–76.

operations and that, at most, his duties were ministerial in nature. Consequently, he argues that there was insufficient evidence to support his conviction on the RICO and ITSP counts.

Mr. Anderson was a relative latecomer to the clearinghouse operation. By all accounts he was hired because of his banking background, and the evidence showed that he had substantial, day-to-day involvement with the clearinghouse bank accounts. Not only was he familiar with the source of clearinghouse funds (undertaker contacts) he was also aware of the fact that speculative ventures were being organized and funded via diverted undertaker funds.[44] Additional evidence of Mr. Anderson's knowledge of, and participation in, the scheme to defraud was his statement to a clearinghouse sales agent to the effect that the bankruptcy petition had been filed to hold regulatory agencies at bay, but that the clearinghouses had ample assets to cover undertaker investments. This representation of clearinghouse assets was false, and Mr. Anderson's knowledge of the financial condition of the operation was well established.

Particularly relevant to his convictions was evidence that, in addition to the clearinghouse accounts, Mr. Anderson controlled other accounts[45] in which hundreds of thousands of dollars in undertaker funds were deposited. From those accounts Mr. Anderson made various disbursements to himself[46] and others, including a $10,000 "loan," to cover a third person's mortgage payment which was never repaid.[47] Anderson-controlled undertaker funds were diverted even after bankruptcy was declared, and those accounts were not listed as part of the bankrupt estate. Mr. Anderson's own affidavits omitted reference to those accounts. From these facts the jury could have found beyond reasonable doubt that Mr. Anderson was a full and knowing participant in the scheme to defraud, including its ITSP, bankruptcy fraud, and mail fraud aspects.

Finally, Mr. Anderson challenges the RICO conviction. In light of our preceding discussion of his extensive involvement in the clearinghouse operation, we find no merit to his RICO challenge. Mr. Anderson's convictions are affirmed.

### G. *Mailings Required by Law as Basis for Mail Fraud Conviction*

Messrs. Cardall and Crowther appeal their conviction on a mail fraud count, arguing that the mailing which served as the basis for the count was a legally compelled mailing; consequently, it could not be the basis for a criminal conviction under 18 U.S.C. § 1341 unless the government proved the mailings were necessary to the execution of the fraudulent scheme. The "legally compelled mailing" in this case was a notification by the Bureau of Land Management that appellants had successfully bid on a BLM lease of potential oil properties in Wyoming.[48]

■ In order to convict a defendant under 18 U.S.C. § 1341 (1982) the government must prove two elements: (1) a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises; and (2) use of the United States mails for the purpose of executing the scheme. *See Pereira v. United States,* 347

**44.** On at least one occasion Mr. Anderson solicited a third party to serve as a token director in one of the Cardall-organized oil ventures funded with undertaker monies.

**45.** Appellant Anderson controlled accounts in the name of Jons Investment Company but listing his brother's name, address, and social security number instead of his own.

**46.** A number of checks from the Anderson-controlled accounts were issued to, and endorsed by, "John D. Anderson," Farrell Anderson's brother. However, Mr. John Anderson's testimony established that he never endorsed those checks nor received any funds therefrom. The evidence indicated that defendant Farrell Anderson was the maker and endorser of those checks.

**47.** This transaction took place in September 1981, after the August payments to undertakers had been missed and after the clearinghouse principals (including Anderson) had discussed the clearinghouse's imminent bankruptcy.

**48.** Appellants diverted clearinghouse funds to make the lease bid.

U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *United States v. Taylor*, 832 F.2d 1187, 1192 (10th Cir.1987). The crux of the parties' disagreement on this point of appeal concerns the second element—whether the use of the mails was "for the purpose of executing the scheme." The government argues that

> [t]he scheme involved here had many aspects, one of which was the diversion of clearinghouse funds for purposes other than that represented to undertakers. Count 21 dealt with such a diversion. Undertaker money were used for acquisition of oil leases and exploration of the leases. The evidence showed that Business Consultants engaged in the acquisition of a number of oil leases and that the one involved in Count 21 was merely a part of a larger plan.... Clearly, the development of land leased by the BLM could not have commenced until receipt of notice of a successful bid.... The notification that one bid had succeeded furthered the scheme. Since the notification came from Wyoming, receipt via the mail was not unexpected.

Appellee's brief, at 32–33.

For their part appellants contend that the object of the fraud was to obtain money from undertakers. Once the money came into the clearinghouse, the "fraud" as to that investor was complete. Therefore, notification by the BLM that they had been awarded the oil lease did not further the scheme in violation of the mail fraud statute.

 In defining the scope of the mail fraud statute, the Supreme Court has instructed that "[t]he federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Kann v. United States*, 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944). To be part of the execution of the fraud, however, the use of the mails need not be an essential element of the scheme, as long as it is "incident to an essential part of the scheme," *Pereira*, 347 U.S. at 8, 74 S.Ct. at

363, or "a step in [the] plot." *Badders v. United States*, 240 U.S. 391, 394, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916). The question in this case is whether this mailing was sufficiently related to appellants' scheme to bring their conduct within the statute. We conclude it was not.

In *Kann* the Supreme Court reversed a mail fraud conviction on the basis that the alleged use of the mails had not been for the purpose of "executing the scheme" in violation of federal law. In that case certain corporate officers and directors had set up a dummy corporation to which they diverted for their own use profits from their employer-corporation. As part of the scheme, certain checks drawn on two separate banks were sent by mail. Those transactions became the basis of the mail fraud counts. The Court held that since the checks had been deposited and the money irrevocably received by defendant, "[t]he scheme in each case had reached fruition." 323 U.S. at 94, 65 S.Ct. at 151. Thus, it was immaterial that the depositor bank had used the mails to seek collection from the drawee bank. The Court concluded that "[i]t [could not] be said that the mailings in question were for the purpose of executing the scheme, as the statute requires." *Id.* The Court distinguished cases where the mails "are used prior to, and as one step toward, the receipt of the fruits of the fraud," *id.*, or when they are used as "a means of concealment so that further frauds which are part of the scheme may be perpetrated." *Id.* at 94–95, 65 S.Ct. at 151.

By contrast, in *Pereira*, the Court upheld the conviction of a man accused of defrauding a widow of her property after marrying her. Defendant had convinced his wife to sell securities she owned in California and to advance him the money for a proposed venture. The securities were sold and a check was sent to Texas, where it was deposited for collection. After the check cleared, a cashier's check was drawn in favor of the defendant, who thereafter disappeared with the money. The Court held that the mailings in *Pereira* played a significant part in enabling the defendant to

acquire dominion over the funds with which he later absconded. Consequently, the conviction under section 1341 was affirmed.

In *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), the Court reversed mail fraud convictions on the basis that the evidence could not support a judgment that the mails had been used as part of a scheme to defraud. The evidence showed, *inter alia*, that the *Parr* defendants had misappropriated, converted, and embezzled funds and property of the Benavides Independent School District in Duval County, Texas, by (1) arranging to have district checks issued in the name of fictitious persons and/or family members; which checks were then cashed for the benefit of defendants; (2) converting checks received by the school district in payment of taxes; and (3) obtaining gasoline and other services through the unauthorized use of school district credit cards.

Defendants argued, and the Court agreed, that those crimes were "essentially state crimes and could become federal ones, under the mail fraud statute, only if the mails were used 'for the purpose of executing such a scheme.'" 363 U.S. at 385, 80 S.Ct. at 1180 (quoting 18 U.S.C. § 1341). The Court concluded that legally compelled mailings, which were lawful in and of themselves, could not be made the basis for a criminal conviction under § 1341 simply because certain individuals who were authorized to make the tax assessment planned to steal some of the tax money after it was received. Moreover, the mailings associated with the unauthorized use of district credit cards could also not support a conviction under section 1341 because there was an insufficient connection between the mailings and the execution of the scheme to defraud. Relying on *Kann*, the Court held that "'[t]he scheme had reached fruition' when [defendants] received the goods and services ... 'irrevocably. It was immaterial to them, or to any consummation of the scheme, how the [oil company] ... would collect from the [District].'" *Id.* at 393, 80 S.Ct. at 1184 (quoting *Kann*, 323 U.S. at 94, 65 S.Ct. at 151).

In *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), another case involving the fraudulent use of credit cards to receive goods and services from motel operators in several states, the Supreme Court again held that the mailings at issue were not sufficiently closely related to the scheme to defraud and therefore did not fall within the purview of section 1341. According to the Court, the scheme to defraud reached fruition when defendants checked out of the motels, and the scheme did not depend on which victim ultimately bore the loss. *Maze*, 414 U.S. at 402, 94 S.Ct. at 649.

The most recent Supreme Court discussion of this issue is found in *Schmuck v. United States*, —— U.S. ——, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). There, a used-car distributor was charged with multiple counts of mail fraud. The scheme to defraud involved the "rolling back" of automobile odometers in used cars and resale of those cars to retail dealers who, in turn, sold the cars to consumers. The mailing of the title-application forms on behalf of the final purchasers formed the basis for the various counts.

Petitioner contended that the title applications were not in furtherance of the fraudulent scheme and, thus, did not satisfy the mailing element of the crime. In holding that the mailing in question fell within the scope of the statute, the Court reemphasized that the mailing must be related to an essential part of the scheme, although the relationship need not be direct. *Id.* 109 S.Ct. at 1448. The Court stated: "[A]lthough the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme." *Id.* The Court distinguished *Kann, Parr*, and *Maze* in that in all three of those cases the fraud had reached fruition, and "the longterm success of the fraud did not turn on which of the potential victims bore the ultimate loss." *Id.* at 1449. By contrast, in *Schmuck* the fraud had not reached fruition because "a failure in [the] passage of title would have jeopar-

dized Schmuck's relationship of trust and goodwill with the retail dealers upon whose unwitting cooperation his scheme depended." *Id.* In sum, then, the mailings related to passage of title were necessary in maintaining the ongoing viability of the fraud.

Unlike the situation in *Schmuck*, the BLM mailing in this case was not necessary in maintaining the ongoing viability of defendant's fraud, either directly or indirectly.[49] It is clear that undertaker funds were employed to acquire and exploit various oil properties, including the successful BLM lease bid, and that those funds were largely acquired by fraud. However, the success of defendants' fraudulent scheme in no way depended upon the receipt of a BLM bid award. The scheme had "reached fruition" at the point that defendants acquired undertaker funds through misrepresentation; we hold that the BLM's use of the mail to notify defendants of the bid award was not "for the purpose of executing the scheme." Consequently, we reverse defendants' convictions on Count 21.

In light of our disposition, we find it unnecessary to decide whether the BLM bid award constituted a legally compelled mailing; and, if so, whether *Parr* would apply to this case in order to defeat the mail fraud conviction.

H. *Argument that Reversal of a RICO Predicate Offense Requires Reversal of the RICO Convictions.*

■ As a final matter, appellants Cardall and Crowther argue that reversal of one or more of the predicate offenses requires reversal of their RICO convictions.[50] Because we have reversed their convictions on one count of mail fraud, we examine the effect of our action on the RICO counts.

We begin our analysis by examining what the government must prove in order to secure a conviction under 18 U.S.C. §§ 1962(c), (d) (1982). Section 1962(c) prohibits any person associated with an enterprise (affecting interstate commerce) from conducting the enterprise's affairs through a pattern of racketeering activity. Section 1962(d) prohibits persons from conspiring to violate any of the substantive RICO provisions, including section 1962(c).

The definition of "pattern of racketeering activity" in the RICO statute "requires at least two acts of racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5) (1982). "Racketeering activity" encompasses a number of crimes identified in the statute, including mail fraud, wire fraud, ITSP, and bankruptcy fraud. 18 U.S.C. § 1961(1) (Supp. V 1987). In order to prevail under section 1962(c) the government had to prove beyond reasonable doubt that defendants conducted the affairs of the clearinghouse enterprise, which undisputedly affected interstate commerce, through a pattern of behavior which included at least two predicate acts of mail fraud, wire fraud, ITSP, or bankruptcy fraud within a ten-year period. In addition, under section 1962(d), the government had to prove agreement among defendants to perform the necessary racketeering acts in furtherance of the affairs of the enterprise.

In addition to the RICO counts, Mr. Cardall was separately convicted on twenty-five other counts, and Mr. Crowther was convicted on eighteen other counts. All of these offenses qualify as RICO predicate

---

**49.** While the government contends that "undertaker funds were expended to develop some of the leases," Appellee's Brief, at 33, it has not directed us to evidence anywhere in the record that the funds were expended in the development of *this* BLM lease. Absent evidence to show that the bid award was but one step in an *ongoing* fraud to which undertaker funds continued to be diverted, we cannot agree with the government's unsupported claims.

**50.** Mr. Willmitt raises a similar argument, but we need not address his contention because we have reversed none of his convictions.

Mr. Holman has also challenged the sufficiency of the evidence supporting his RICO convictions. Because improperly admitted evidence may have colored Mr. Holman's conviction, we have reversed and remanded for a new trial. The jury may have also relied upon the FSI evidence in considering his guilt on the RICO counts. Consequently we reverse the RICO convictions and remand for a new trial on those counts as well.

offenses. The fact that we have overturned their conviction on one mail fraud count does not eliminate the fact that ample independent grounds exist to sustain the RICO conviction.

Appellants' reliance on *United States v. Ruggiero*, 726 F.2d 913 (2d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984), is unwarranted. In *Ruggiero* the Second Circuit reversed a defendant's RICO conspiracy conviction after concluding that one of the crimes charged did not qualify as a RICO predicate act. However, the *Ruggiero* court's decision turned on the fact that defendants were never separately convicted of the predicate offenses alleged in support of the RICO count. The jury's finding that defendant had violated § 1962(d) therefore depended on the *inference* that the jury had found that defendants committed at least two of the alleged offenses. Since the jury's verdict may have rested on a legally insufficient basis, the RICO conviction had to be reversed.

The circumstances in this case clearly differ from those in *Ruggiero*. In our judgment, this case is more like *United States v. Weisman*, 624 F.2d 1118 (2d Cir.), *cert. denied*, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980). In *Weisman* the appellant challenged his RICO conviction claiming that certain conspiracy counts were improperly considered as predicate acts under RICO. Although the court squarely rejected that contention, it noted that even if defendant's contentions were correct, the RICO conviction was nevertheless valid because the separate substantive crimes charged in the indictment were also alleged in the RICO count as predicate acts of racketeering. *Weisman*, 624 F.2d at 1123–24. As a result, "the [*Weisman*] court was assured by the separate convictions that the jury had found defendant guilty of committing at least two of the predicate acts" necessary for conviction. *Ruggiero*, 726 F.2d at 922 (distinguishing *Weisman*). Here, likewise, the substantive crimes of mail fraud, wire fraud, ITSP, and bankruptcy fraud were specifically alleged as predicate racketeering acts in the RICO counts. Thus, the separate convictions justify our conclusion that the jury found the necessary predicates to the RICO convictions. Messrs. Cardall and Crowther's RICO convictions are affirmed.

### III.

Based on the foregoing discussion, the verdict and judgment below is AFFIRMED in part, REVERSED in part. We REMAND for a new trial on the charges against Mr. Holman.